[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11749

_____

D.C. Docket No. 5:13-cv-00045-LGW-RSB

PHYLLIS J. MAY

Plaintiff – Appellant,

versus

CITY OF NAHUNTA, GEORGIA,
DARREN CREWS,
Former Chief of Police of the City of Nahunta
Police Department, in his individual capacity,
TOMMY L. ALLEN,
In his individual capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(November 15, 2016)

Before JORDAN and ANDERSON, Circuit Judges, and DALTON,[*] District Judge.

DALTON, District Judge:

The instant appeal calls on us to determine whether an otherwise authorized mental-health seizure was converted into an unconstitutional one by virtue of the seizing law enforcement officer's conduct. In particular, Appellant Phyllis J. May ("May") challenges the district court's grant of summary judgment in favor of Appellee Tommy L. Allen ("Officer Allen") on the basis of qualified immunity.[1] After a thorough review of the record and the parties' briefs, and with the benefit of oral argument, we affirm in part, reverse in part, and remand this matter to the district court for proceedings consistent with this Opinion.

**I**[2]

The events preceding the underlying action took place on August 3, 2011. After a taxing few days taking care of her Alzheimer-stricken mother, May fell into a deep sleep. At the time, May was the sole caregiver for her mother, who—in addition to Alzheimer's disease—suffers from Sundowner's Syndrome, a condition

---

[*] The Honorable Roy B. Dalton, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

[1] Appellant does not challenge the district court's grant of summary judgment in favor of the remaining Appellees.

[2] The following facts are taken from the evidence submitted by the parties. Where the evidence conflicts, the facts are construed in the light most favorable to May, the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006).

2

that causes her to stay awake for days at a time. (R34-6, pp. 5–6.) Before laying down, May called her brother, Ronnie Jacobs ("Jacobs") to relieve her. (*Id.* at 7, 8, 10.) May told Jacobs that her "body [was] going down" and she could "take it no longer." (*Id.* at 10.)

Some two or three hours later, Jacobs had still not arrived, despite living in a trailer adjacent to May's residence. (*See* R34-7, p. 32.) By that time, May's mother had grown concerned at the length of time May had been laying down and went to Jacob's trailer to retrieve him. (*Id.*) Back at the residence, Jacobs was unable to rouse May and called 911. (*See id.* at 32–33, 40.) In response, four emergency medical technicians ("EMTs")—three males and one female—arrived at the house, followed by May's sister, Wanda Smith ("Smith"). (R34-6, pp. 11, 20–21; R41-2, ¶¶ 3–4.) After checking May's vital signs, the EMTs placed an ammonia capsule under her nose. (R34-7, pp. 37–38.) The harsh smell woke her up. (R34-6, pp. 11, 13.)

The EMTs asked May a series of questions about her health. (*Id.* at 14–15.) May told them that she had been diagnosed with caregiver breakdown and Pick's disease, which she described as cerebral atrophy, or shrinking of the brain, accompanied by symptoms of headaches and seizures. (*Id.* at 14.) After May declined to go to the hospital, the EMTs determined that she did not require any further medical treatment. (*Id.* at 15; R41, ¶ 8.) May then executed a form refusing

3

medical treatment and transport to the hospital, which Smith witnessed. (R41-1, ¶ 11.)

In the interim, Officer Allen received a call from 911 requesting his assistance at May's residence. (R39, p. 18.) Upon his arrival, an EMT advised him that May had "been a little combative to herself" and was upset. (*Id.* at 21.) Another EMT purportedly told Officer Allen that May had been clasping her fists and "scruffing and hitting herself in the head." (*Id.* at 25.) Consequently, Officer Allen entered May's bedroom to investigate. (*See id.* at 24–26.) There, he observed that her hair was "all over her head in disarray." (*Id.* at 49.) Based on the EMTs' statements, coupled with his own observations, Officer Allen made the decision to seize May in her bedroom and transport her to the hospital for a psychological evaluation.

In conducting the mental-health seizure, Officer Allen asked the EMTs to leave the room and locked the door behind them. (R34-6, pp. 16–17.) Officer Allen then told May that she was going to the hospital and instructed her to take off her nightgown and put on more suitable clothing. (*Id.* at 17, 18; R39, p. 28.) May began to cry. (R34-6, p. 18.) Despite her urging, Officer Allen refused to leave the room while she changed. (*Id.* at 72.) Instead, Officer Allen began handing May her clothes and touched her shoulder roughly in an effort to pull off her nightgown. (*Id.* at 18–19.) After she had put on her shorts, Officer Allen instructed her to take

them off and first put on her undergarments. (*Id.* at 20.) When May refused, Officer Allen replied, "Yes, you will," and patted his gun. (*Id.*) Officer Allen remained in the locked room alone with May for fifteen to twenty minutes, all the while ignoring Smith's requests from the other side that he open the door.[3] (R34-7, p. 44; R34-6, pp. 20–21.)

After the two emerged from the room, Officer Allen announced that he was taking May to the hospital to talk with "someone in crisis." (R34-6, p. 45; R39, p. 24.) Outside the house, May told Jacobs that she did not want to go to the hospital. (R34-6, pp. 72–73.) Nonetheless, Officer Allen placed May in the back of his police car and took her to Satilla Regional Medical Center in Waycross, Georgia. (*Id.* at 24; *see also* R39, p. 44.)

Once they arrived at the hospital, Officer Allen escorted May to the emergency room. (R34-6, pp. 24–25.) Inside, Officer Allen requested a hospital room for May and asked the staff about her prior diagnoses. (*Id.* at 25.) After hospital staff informed him that May suffered from Pick's disease and caregiver breakdown, Officer Allen left the hospital. (*Id.* at 25–26.)

---

[3] Officer Allen largely disputes May's version of events. For example, though he admits that he and May were alone in her room with the door closed, he denies that he locked the door and contends that he only remained in the room with her for five or six minutes. (R39, pp. 26, 31–32, 35–36). He also denies that May disrobed in front of him or that she was naked. (*Id.* at 31–32.) However, Officer Allen did concede that May inadvertently exposed her left breast in his presence as she was putting on her t-shirt. (*Id.* at 29, 37–38.)

May spent no more than two hours at the hospital before she was dismissed. (R34-7, p. 52.) During this time, she spoke with a nurse from psychiatry and had some blood work performed. (R34-6, p. 48.) According to May, another nurse told her that there was nothing wrong with her. (*Id.* at 26.)

Pursuant to 42 U.S.C. § 1983, May subsequently brought suit in the United States District Court for the Southern District of Georgia against Officer Allen, the City of Nahunta, Georgia, and then-City Chief of Police Darren Crews ("Officer Crews").[4] (R1.) May alleged: (1) that Officers Allen and Crews unlawfully seized her in violation of the Fourth and Fourteenth Amendments (R1, ¶¶ 49–57); (2) that Officer Allen falsely imprisoned her in violation of the Due Process Clause of the Fourteenth Amendment (*see id.* ¶¶ 58–66); and (3) municipal liability against the City for the actions and inactions of Officers Allen and Crews (*id.* ¶¶ 32–34, 36–39, 42–46). May also asserted state law claims against Officer Allen for assault and battery, invasion of privacy, and false imprisonment. (*Id.* ¶¶ 67–89.)

Defendants later moved for summary judgment on grounds of qualified immunity and official immunity. (*See* R45, pp. 19–20, 38.) Based on its finding that Officer Allen had probable cause to seize May, the district court granted Officer Allen qualified immunity with respect to May's federal claims. (*Id.* at 24–25) Additionally, the district court concluded that no clearly established law would

---

[4] May's claims against Officer Crews appear to be based on vicarious liability for Officer Allen's conduct.

have put Officer Allen on notice that his actions were unlawful. (*Id.* at 25, 31–32.) As to May's state law claims, the district court held that Officer Allen was entitled to official immunity because May had not met her burden of demonstrating that he acted with actual malice. (*Id.* at 40–41.) The district court also granted summary judgment in favor of Officer Crews and the City. This appeal followed.

## II

We review a district court's grant of summary judgment based on the defense of qualified immunity de novo. *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003). "Summary judgment is appropriate only when the evidence before the court demonstrates that 'there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

## III

"Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities." *Holmes*, 321 F.3d at 1077. In evaluating a government actor's entitlement to qualified immunity, the Supreme Court has developed an objective-reasonableness test wherein "the official's actions must be evaluated against 'clearly established law,' consisting of statutory or constitutional rights that a reasonable person should have known." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

7

In particular, once we determine that a defendant was acting within his discretionary authority at the time of the challenged conduct, we engage in a two-prong analysis to evaluate whether he is entitled to qualified immunity. *See Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011). First, we consider whether the facts—viewed in the light most favorable to the plaintiff—establish that a constitutional right has been violated. *Id.* Second, we determine whether that right was clearly established at the time of alleged conduct. *Id.* "Both elements of this test must be satisfied for an official to lose qualified immunity, and this two-prong inquiry may be done in whatever order is deemed appropriate for the case." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010).

## A

The parties do not dispute that Officer Allen was acting within the scope of his discretionary authority at the time of the alleged events. Therefore, with respect to May's unlawful seizure claim, the first issue we must decide is whether Officer Allen is entitled to qualified immunity for his initial decision to seize and then transport May to the hospital.[5]

## 1

"The Fourth Amendment protects people from unreasonable searches and seizures." *Roberts*, 643 F.3d at 905. "For Fourth Amendment purposes, a seizure

---

[5] We will address whether Officer Allen is entitled to qualified immunity with respect to the manner of such seizure in Part C of this Opinion.

occurs when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "An encounter between a police officer and a citizen becomes a seizure when 'a reasonable person would not feel free to terminate the encounter.'" *Id.* (quoting *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)). In the context of a mental-health seizure, "[w]hen an officer stops an individual to ascertain that person's mental state (rather than to investigate suspected criminal activity), the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others." *Id.*

There is no question that May was seized during the alleged incident. According to May's version of the facts, Officer Allen restrained her freedom by confining her to the bedroom and transporting her to the hospital for a psychological evaluation against her will. Thus, we must determine whether such seizure was unreasonable under the Fourth Amendment.

In doing so, "our inquiry is a dual one." *Terry*, 392 U.S. at 19–20. First, we consider "whether the officer's action was justified at its inception." *Id.* at 20. We then consider whether the seizure "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

9

Here, we conclude that, at its inception, Officer Allen's action in seizing May for a psychological evaluation was justified. "[T]o be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause, but only 'arguable probable cause'"—that is, "the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed." *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). Based on the evidence, we hold that Officer Allen had arguable probable cause to seize May for a psychological evaluation.

The facts at hand are similar to those present in *Roberts v. Spielman*, 643 F.3d 899 (11th Cir. 2011), which was decided about seven weeks before the events at issue here. In *Roberts*, an officer reported to the plaintiff's home in response to a 911 call concerning a possible suicide attempt. *Id.* at 902. Upon his arrival, the officer spoke with the plaintiff's former sister-in-law, who informed him that: (1) she had been trying to make contact with the plaintiff for an hour; and (2) the plaintiff had a history of suicide attempts and was on medication for bipolar disorder. *Id.* After knocking repeatedly to no avail, the officer opened the back door a few inches and identified himself. *Id.* Roberts became verbally abusive toward the officer and made an ambiguous threat, thereby prompting the officer to escort her out of the house. *Id.* at 902–03. The officer then explained to Roberts that he had been called to perform a welfare check at her home. *Id.* at 903. Because

10

Roberts did not threaten her life in his presence, the officer declined to take her into custody for an evaluation and subsequently left. *See id.*

Based on the foregoing events, the plaintiff brought suit under 42 U.S.C. § 1983, alleging that the officer violated her Fourth Amendment right to be free from unreasonable searches and seizures. *Id.* at 901. The officer moved for summary judgment on the basis of qualified immunity. The district court ultimately held that the officer was not entitled to qualified immunity because he was acting outside the scope of his discretionary authority. *Id.*

On appeal, we reversed the district court's denial of qualified immunity and held that the officer's conduct did not violate the Fourth Amendment. *Id.* at 906. Crucial to our analysis were the following facts: (1) that the officer had been dispatched in response to a 911 call; (2) the statements made to the officer by the plaintiff's sister-in-law; and (3) that there was nothing in the record to suggest that the officer should have doubted the information given to him by the plaintiff's relative. *Id.* Based on these facts, as well as Roberts' behavior following the officer's arrival, we held that the officer could have reasonably believed that Roberts posed a danger to herself, thereby justifying his decision to seize her to investigate the relative's concerns. *Id.*

As in *Roberts*, on the day of the incident, Officer Allen reported to May's home in response to a 911 call requesting police assistance. After he arrived, two

EMTs respectively told him that May had been: (1) "a little combative to herself" and was upset (R.39, p. 21); and (2) clasping her fists and "vigorously . . . scruffing and hitting herself in the head" (*id.* at 25). Officer Allen's own observations corroborated these statements, as he testified that May's hair was "all over her head in disarray." (*Id.* at 49.) In light of the EMTs' statements and his respective observations, Officer Allen could reasonably have believed that May posed a danger to herself.

Officer Allen's decision to transport May to the hospital warrants the same conclusion. Notably absent from the record is any evidence that May's mother, sister, or brother protested Officer Allen's announcement that he was taking her to the hospital. Moreover, in view of the chilling effect that a contrary ruling may have in this context, we are reluctant to second guess an officer's decision to transport a person to the hospital to evaluate possible mental-health concerns.

## 2

Ordinarily, our analysis would end there. Indeed, once arguable probable cause is established, there is no need to address whether clearly established law governs the challenged conduct. Nonetheless, though we affirm the district court's holding that Officer Allen was entitled to qualified immunity for the initial seizure, we find that the district court erred in concluding that the right to be free from an unreasonable mental-health seizure was not clearly established on August 3, 2011.

Importantly, our decision in *Roberts*—rendered on June 14, 2011—laid out the specific parameters for the lawful seizure of an individual for psychiatric evaluation. In reaching a contrary conclusion, the district court underscored the absence of a constitutional violation in *Roberts*. However, clearly established law requires only that factually applicable case law stake out a bright line and clearly establish the contours of a constitutionally protected right. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994); *cf. Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) ("When looking at case law, some broad statements of principle are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts."). Consequently, the law need only be clearly articulated to be clearly established; a finding of unconstitutional conduct on the facts is not always required. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.").

Thus, when a binding decision establishes the legal standard for conduct and then measures the specific conduct at issue against that standard, it is of no

13

moment whether the conduct is found to be constitutionally impermissible. The legal standard is the rationale necessary to the holding in the case, and that standard establishes the contours of the constitutionally protected right.

The decision in *Roberts* established—and clearly established—both the legal standard that governs the level of suspicion required for a seizure in the mental-health context and the kind of facts that might warrant such a seizure—namely, facts indicating that such person may pose a danger to himself or others. Under *Roberts*, the level of suspicion required for a mental-health seizure is probable cause, characterized as a "probability or substantial chance of dangerous behavior." *Roberts*, 643 F.3d at 905–06 (quoting *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)). Having established the level of suspicion necessary to justify such a seizure, the *Roberts* court then evaluated the specific conduct at issue and held that the defendant-officer "could reasonably have believed that Roberts posed a danger to herself that justified [his conduct]." *Id.* at 906.

Specifically, *Roberts* held that "[w]hen an officer stops an individual to ascertain that person's mental state (rather than to investigate suspected criminal activity), the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others." *Id.* at 905. This standard provided fair warning to Officer Allen that he would need to have

probable cause to believe that May was a danger to herself or to others to justify seizing her on mental-health grounds.

Because we conclude that Officer Allen had arguable probable cause to seize May, we find the district court's erroneous conclusion that the standard was not clearly established to be harmless error. Thus, we affirm the district court's ultimate holding as to the propriety of Officer Allen's initial decision to seize and transport May to the hospital.

**B**

We similarly conclude that Officer Allen is entitled to qualified immunity on May's § 1983 false imprisonment claim.

"A § 1983 claim of false imprisonment requires a showing of common law imprisonment and a due process violation under the Fourteenth Amendment." *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). "The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement." *Id.* A plaintiff must also prove that the defendant acted with deliberate indifference in violating the plaintiff's right to be free from continued detention after the defendant knew or should have known that the detainee was entitled to release. *Id.*

At oral argument, May confirmed that her false imprisonment claim, like her unlawful seizure claim, was based on her detention by Officer Allen in her

15

bedroom through the time that she was taken to the hospital. In light of our finding that Officer Allen had arguable probable cause to seize May and transport her to the hospital, we find that May has not shown that Officer Allen acted with deliberate indifference by knowingly or recklessly violating her right to be free from continued detention after she was entitled to release. Thus, we affirm the district court's grant of summary judgment in favor of Officer Allen on May's § 1983 false imprisonment claim.

## C

Having determined that Officer Allen is entitled to qualified immunity on the issue of whether the seizure was justified at its inception, we now address whether the manner of the seizure was unreasonable. Because we determine that questions of fact exist with respect to whether the seizure was conducted in an extraordinary manner, unusually harmful to May's privacy interests, *Whren v. United States*, 517 U.S. 806, 818 (1996), we conclude that the district court erred in granting Officer Allen qualified immunity for his conduct during the seizure.

## 1

Under the Fourth Amendment, an individual is entitled to be free from unreasonable government intrusion wherever he harbors a reasonable expectation of privacy. *Terry*, 392 U.S. at 9. The legality—and, thus, reasonableness—of an officer's conduct is often judged "by balancing its intrusion on the individual's

16

Fourth Amendment interests against its promotion of legitimate, governmental interests." *Bouye v. Marshall*, 102 F. Supp. 2d 1357, 1362–63 (N.D. Ga. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)), *aff'd sub nom.*, *Bouye v. Gwinnett Cty.*, 265 F.3d 1063 (11th Cir. 2001).

However, where adequate justification for the initiation of the seizure has been found, courts limit their application of the balancing analysis to "searches or seizures conducted in an extraordinary manner"—that is, searches and seizures conducted in a manner "unusually harmful to an individual's privacy or even physical interests." *Whren*, 517 U.S. at 818. *Inter alia*, these "extraordinary manner" cases may involve seizure by means of a deadly weapon. *Id.*

"Whether a search or seizure is 'extraordinary' turns, above all else, on the manner in which it is executed." *Atwater v. City of Lago Vista*, 532 U.S. 318, 322 (2001). Given that "[t]he Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation," the manner in which a seizure is conducted is "as vital a part of the inquiry as whether [it was] warranted at all." *Terry*, 392 U.S. at 28–29. At bottom, a government actor must employ reasonable means.[6] *See Evans v. Stephens*, 407 F.3d 1272, 1281 (11th Cir. 2005).

---

[6] The question of reasonableness may sometimes turn on whether less intrusive means were practically available to accomplish the objective of the seizure, as in the context of an unduly intrusive search or an extended detention. *See, e.g.*, *Gray ex rel. Alexander v. Bostic*,

Thus, an initially constitutional seizure can become unconstitutional where it is executed in an extraordinary manner, thereby subjecting the officer's conduct to a balancing analysis. While usually evaluated in the context of excessive force, that is not the only way that an otherwise authorized seizure might be conducted in such an extraordinary manner so as to constitute a constitutional violation. Applying the foregoing analysis here, the question we must answer is whether—considering the totality of the circumstances—an objectively reasonable officer would have known that May's right to personal security was unreasonably violated by Officer Allen's actions following the initial seizure. *See Terry*, 392 U.S. at 9.

Officer Allen arrived at May's home to assist EMTs in responding to a 911 call. Based on the EMTs' statements to Officer Allen, the government interest was the promotion of safety, the elimination of self-harm, and the investigation of mental-health concerns. Balancing the government interest against May's interest in bodily sanctity and personal security, we conclude that Officer Allen's actions exceeded the scope of the underlying justification and that he failed to use reasonable means to rectify the situation. Thus, while Officer Allen had at least arguable probable cause to seize and transport May to the hospital for evaluation,

---

458 F.3d 1295, 1306 (11th Cir. 2006) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). For example, a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Muehler v. Mena*, 544 U.S. 93, 100 (2005) (stating that the duration of a detention can also affect the balance of interests).

the manner in which he chose to do so was unreasonable, thereby violating May's Fourth Amendment rights.

In concluding that Officer Allen's actions were objectively reasonable under the circumstances, the district court evidently placed little emphasis on the allegedly egregious manner in which the seizure was performed. Though admitting that Officer Allen's conduct may have been "indelicate," the district court focused almost solely on whether Officer Allen had probable cause to seize May in the first place. (R 45, p. 41.) Such was error.

Specifically, on May's version of the facts, Officer Allen detained May in a locked room for twenty minutes and forced her to disrobe. Officer Allen's purported rationale was to: (1) get May to change out of her nightgown and put on more appropriate clothing for transport to the hospital; and (2) ensure that May did not harm herself in the interim. Notwithstanding these objectives, it was clearly inappropriate for a male officer to lock himself in a room with a woman in a state of undress under the circumstances, particularly after she asked him to leave. The unreasonableness of such conduct is further underscored by his failure to summon the female EMT or any of May's female relatives present at the residence.[7] As intimated at oral argument, one could certainly conclude that it was unreasonable

---

[7] According to the deposition testimony of Officer Crews, the City did not have any female police officers at the time. (R38, p. 35.)

for Officer Allen *not* to ask the female EMT to remain with May while she disrobed. Even more troubling is the testimony that Officer Allen attempted to pull May's nightgown from her shoulder and used the threat of deadly force to compel her to remove her shorts, in order to first put on undergarments, by patting his gun after she initially refused. Based on the totality of these facts, one could conclude that the manner in which Officer Allen conducted the seizure violated May's Fourth Amendment right. Moreover, not only could Officer Allen's patent disregard for May's personal dignity be deemed unreasonable, but so could the prolonged duration of the seizure. Thus, we conclude that factual questions remain with respect to whether Officer Allen's conduct violated May's constitutional right to personal security.

**2**

Our final inquiry concerns whether, under the circumstances, May's right to be free from a seizure in which she was compelled—by threat of deadly force—to disrobe in front of a male police officer, with whom she remained alone in a locked room for twenty minutes, was clearly established on August 3, 2011. We conclude that it was.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard*, 311 F.3d at 1350. "Our circuit

uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). "The first method looks at the relevant case law at the time of the violation; the right is clearly established if 'a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law.'" *Id.* at 1291 (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008)).

"The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." *Id.* (quoting *Vinyard*, 311 F.3d at 1355). "In such circumstances, the violation is obvious." *Evans*, 407 F.3d at 1282.

Applying the obvious clarity test to May's version of the facts, we hold that an objectively reasonable officer would have known to refrain from engaging in degrading and humiliating methods when preparing to transport a person of the opposite gender for a psychological evaluation. Given our prior holding that searches performed in an "abusive fashion" may violate the Constitution, *Evans*, 407 F.3d at 1281, an objectively reasonable officer would have known that, under the circumstances, it was unreasonable to use the threat of deadly force to compel a

female civilian to disrobe in that manner. Indeed, if established, Officer Allen's conduct is representative of the type of unnecessarily invasive and demeaning intrusion that is undoubtedly within the sphere of what the Fourth Amendment prohibits.

Quite simply, the Fourth Amendment ensures a person's right "to be secure in their persons [and] houses" against unreasonable seizures. U.S. CONST. amend. IV. As such, any objectively reasonable officer would have known that the "degrading and forceful manner" in which Officer Allen conducted this seizure was patently unreasonable. *Evans*, 407 F.3d at 1283; *see also Hope*, 536 U.S. at 745 (finding that the defendants violated clearly established law under the obvious clarity test where the plaintiff "was treated in a way antithetical to human dignity" by being "hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous").[8]

In *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), we found that strip searches performed during a post-arrest criminal investigation were unreasonable at both their inception and with regard to the manner in which they were performed. *Id.* at 1278. In applying the obvious clarity test, we took issue with the following circumstances: (1) that the plaintiffs were searched in an abnormal

---

[8] Even the testimony of Officer Crews supports May's position, as Officer Crews implied that Officer Allen should not have laid his hands on her. (*See* R38, pp. 37.)

place—a broom closet—"thus, capable of exciting more fear"; (2) that "[l]ittle respect for privacy was observed"; (3) that the officers used unnecessary force; and (4) that the officers used threatening language toward the plaintiffs. *Id* at 1281–82.

Given Officer Allen's alleged disregard for May's privacy, his use of forcible language coupled with the threat of deadly force, the prolonged duration of the seizure, and the inappropriateness inherent in the circumstances, we similarly conclude that "the supposed facts of this case take the manner of [seizure] well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct." *Id.* at 1283 (quoting *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000)). Here, as in *Evans*, the violation was obvious. As such, qualified immunity was inappropriate, and the district court erred by granting summary judgment in favor of Officer Allen on that ground.

**IV**

At oral argument we posited the following hypothetical to the parties. An officer initiates a traffic stop. Although the officer had probable cause for the initial stop, during the course of the traffic stop, he requests that the driver disrobe. When the driver refuses, the officer pats his gun, and the driver then complies. Subsequently, the officer tells the driver to put her clothes back on and lets her go. When asked whether the foregoing conduct would unreasonably violate the

driver's privacy, counsel for the Appellees conceded that it would. We see no reason to treat the present circumstances differently.

In sum, we hold that Officer Allen is protected by qualified immunity from May's challenge to his *decision* to seize and transport her to the hospital, but he is not entitled to qualified immunity from May's claims challenging the *manner* of such seizure. Accordingly, we affirm the district court's grant of qualified immunity with respect to the initial seizure. However, we reverse and remand on the question of whether Officer Allen's conduct during the seizure was done in an extraordinary manner unusually harmful to May's privacy interests.[9]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[9] After review of the record, we find no reason to disturb the district court's ruling on the issue of official immunity for May's state law claims.

24