**FOR PUBLICATION**

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13309

_____

ABIGAIL JEAN MARBUT,

*Plaintiff-Appellant*

*versus*

MATTHEW PHILLIPS,
   in his individual capacity,
JOSHUA CASH,
   in his individual capacity,
KIRBY COLLIER,
   in his individual capacity,
JUSTIN PENA,
   in his individual capacity,

*Defendants-Appellees,*

MICHAEL DAVID LECROY,
   in his individual capacity and official capacity as a Sargent in the
   Henry County Police Department,

*Defendant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-00776-VMC

————————————

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and
CONWAY,* District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether four police officers are entitled to qualified immunity from a complaint that they violated the Fourth Amendment when they seized a suspected overdose victim. After Abigail Marbut fell unconscious, her mother called 911 because she feared that Marbut had overdosed on the drug GHB. Police officers and medical professionals arrived as Marbut began to stir in the back seat of a vehicle parked near her apartment. But Marbut refused to accept any aid and abruptly informed one of the officers that she was going inside to use the restroom. A scuffle ensued as Marbut attempted to move past the officer, and three other officers joined the fray. Marbut suffered a broken arm during the struggle. She sued the officers for unlawful detention and excessive force in violation of the Fourth Amendment. The district court granted summary judgment for the officers based on qualified immunity. Because the officers did not violate Marbut's clearly established Fourth Amendment rights, we affirm.

_____

* The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

## I. BACKGROUND

The record includes footage from multiple bodycam videos. We recount the facts "in the light depicted by the video[s]." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Where the video evidence is not clear, we construe the facts in the light most favorable to Marbut. *Baxter v. Santiago-Miranda*, 121 F.4th 873, 883 (11th Cir. 2024).

On the afternoon of May 20, 2021, Abigail Marbut rode with her mother, Renee, from her apartment to the grocery store. Marbut became "incoherent" as Renee drove back and "passed out" before Renee reached Marbut's residence. Unable to rouse her, Renee called 911 to report that Marbut was "unresponsive." An operator dispatched police officers and medical personnel to the scene.

Officer Matthew Phillips was among the first to arrive. He observed Marbut unconscious in the back seat of a Jeep parked behind the apartment. Renee explained to Officer Phillips what she had witnessed on the drive home and stated that the situation "freak[ed] [her] out" and was "the scariest thing [she had] ever seen in [her] life." She also stated that Marbut might have overdosed on the drug "GHB," short for gamma-hydroxybutyric acid. GHB is a "sedative-hypnotic" that "can produce drowsiness, dizziness, nausea, visual disturbances, unconsciousness, seizures, severe respiratory depression[,] and coma." *United States v. Fisher*, 289 F.3d 1329, 1331 (11th Cir. 2002). The parties agree that a GHB overdose "usually requires emergency medical treatment." Marbut began to stir

about 30 seconds after Officer Phillips arrived. Officer Phillips commented that Marbut appeared to be "on the nod," which meant "her body [was] trying to put her to sleep but she [was] trying to stay awake to fight the effects of whatever was taken."

Amanda Pitts, an advanced emergency technician, and Adam Bedford, a paramedic, arrived shortly thereafter. Marbut "couldn't answer any of [their] questions" when they began their assessment. "She kept lapsing a lot of stuff she was trying to say, or the stuff she said didn't make any sense. It was just noises [and] moaning, or she . . . wouldn't give . . . an answer at all."

Renee stated that Marbut had been unconscious for approximately 20 minutes and reiterated her suspicion that Marbut was under the influence of drugs. Renee stated that Marbut would be "going to rehab" and "I'm not putting up with this no more." Renee's boyfriend likewise stated that "I've gotta get her in rehab or a mental institution or something."

Marbut exited the Jeep four minutes after she began to stir. She later admitted that she became "very agitated" because Renee had called 911 and she did not want "to get checked out at the hospital." Video footage shows her circling the Jeep while shouting "I'm not going," "I haven't done anything," and "I'm not doing it." Officer Phillips asked Bedford if Marbut "ha[d] to go" to the hospital, and Bedford responded that "technically we['ve] got to take her." As Officer Phillips conversed with Bedford, Marbut positioned herself between a hatchback and a sedan parked in adjacent

spaces next to her apartment building. The two vehicles were just a few feet apart from each other and several feet in front of the Jeep.

By this time Officer Justin Pena had arrived. Officer Pena attempted to speak with Marbut near the trunk of the sedan, and Officer Phillips walked around to the front of it. Officers Joshua Cash and Kirby Collier appeared a few minutes later, with Officer Cash standing next to Officer Phillips and Officer Collier standing near Officer Pena. Pitts, Bedford, and another medic also stood near Officer Pena.

Marbut stayed between the hatchback and the sedan for five minutes as medics and officers urged her to go to the hospital. She managed to provide her name, address, and birthday in response to renewed questioning from Pitts but could not remember her birth year. Pitts then stated that Marbut had two options: go to the hospital with the medics or go there with the officers. Marbut refused, and Pitts repeated her ultimatum. Marbut continued to insist there was "nothing wrong" with her. Officer Pena interjected that Marbut did not "have a choice," and Marbut shouted that she "did not do anything wrong."

Three minutes into the back-and-forth, Pitts told Officer Pena that "[w]e would like to take her so she can be evaluated but if she can tell us who she is and answer all our questions properly [then] technically we are not allowed to take her." Pitts opined less than a minute later that Marbut was "sound of mind" because she could "answer her name, date of birth, [and] where she's at." Officer Pena asked Pitts and the medic standing next to her how they

would like to proceed. The medic said that he wanted to "get [Marbut] up to the truck and check her out," so Officer Pena tried again. But Marbut again refused. Pitts then told Officer Pena that "if [Marbut] doesn't want to come with us she doesn't have to." Officer Pena responded that he would do "whatever you guys want to do."

Twenty seconds passed before Marbut abruptly turned toward Officer Phillips and said she needed to use the restroom. Marbut "had to go by Officer Phillips, who was standing between [the hatchback and the sedan] parked close together in the driveway," to reach the restroom. Video makes clear that Marbut attempted to pass Officer Phillips on his left side, that Officer Phillips's left hand was resting on the hatchback when Marbut began approaching him, and that Marbut reached Officer Phillips within two seconds of her announcement that she intended to go inside.

When Marbut reached Officer Phillips, he placed his right hand on her left arm and told her to "hold on, hold on." Marbut repeated that she needed to use the restroom and extended her left hand toward Officer Phillips's chest. Officers Phillips, Collier, and Cash later described this movement as a "push," and Marbut described it as an attempt to "turn[] sideways" to "get away" from Officer Phillips. A video records Officer Phillips moving back following the contact as Marbut withdraws her arm—consistent with the officers' description of a push. Officer Phillips then yelled "do not put your hands on me!" and grabbed Marbut by the right arm, pulling it behind her back.

The officers struggled to subdue Marbut for the next few minutes. Officer Phillips maintained control of her right arm, and Officer Pena gained control of her left arm. Marbut continued to resist and kneed Officer Collier as he moved in. Officer Phillips then noticed that Marbut's right arm was broken and informed his colleagues. The officers immediately eased up, only for Marbut to struggle more. Officers Cash and Collier managed to handcuff Marbut's left arm to her belt loop as she shouted profanities. But Marbut struggled still and kicked Officer Cash in the process.

Eventually, Marbut cooperated enough for Officer Collier to walk her to a gurney. Paramedics transported Marbut to a nearby hospital, and doctors there confirmed that she had "suffered a fracture of the humerus bone in her right arm." Marbut now has a "permanent injury to the radial nerve in her right arm" that causes "weakness" and "a loss of motion at the elbow and shoulder."

Marbut sued Officers Phillips, Cash, Collier, and Pena for alleged violations of the Fourth Amendment committed under color of law. *See* 42 U.S.C. § 1983. She alleged that the officers seized her "without reasonable suspicion or probable cause." She alleged that they used excessive force in seizing her. And she alleged that Officers Cash, Collier, and Pena should have intervened when Officer Phillips broke her arm.

The officers moved for summary judgment based on qualified immunity, and the district court granted them summary judgment. It ruled that the officers had probable cause to execute a

"mental-health seizure." It ruled that the officers used objectively reasonable force under the circumstances. And it ruled that there was no duty to intervene. Absent any constitutional violation, the district court concluded the officers were "entitled to qualified immunity . . . as a matter of law."

Marbut filed this appeal. She continues to contend that the four officers lacked a sufficient basis to seize her, that Officer Phillips used excessive force, and that the other officers should have intervened. But she no longer contends that Officers Cash, Collier, and Pena used excessive force.

## II. STANDARD OF REVIEW

We review *de novo* whether officers are entitled to summary judgment based on qualified immunity. *Aguirre v. Seminole County*, 158 F.4th 1276, 1297 (11th Cir. 2025). We may affirm a summary judgment on any ground supported by the record. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1263 (11th Cir. 2023).

## III. DISCUSSION

Qualified immunity shields from suit a police officer acting within his discretionary authority unless a plaintiff establishes that "the officer violated a constitutional right" that was "clearly established" at the time of the alleged violation. *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020) (citation and internal quotation marks omitted). Marbut does not dispute that the officers acted within their discretionary authority. So the question for us is whether the officers violated her clearly established constitutional rights.

We divide our discussion into three parts. We first explain that the officers are entitled to qualified immunity from Marbut's unlawful-seizure claim. We next explain that Officer Phillips is entitled to qualified immunity from Marbut's excessive-force claim. We then explain that the other officers are entitled to qualified immunity from Marbut's intervention claim.

### A. The Officers Enjoy Qualified Immunity from the Unlawful-Seizure Claim.

"The Fourth Amendment protects people from unreasonable seizures." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022) (alteration adopted) (citation and internal quotation marks omitted). A seizure occurs when an officer uses "physical force or [a] show of authority" that would lead a "reasonable person [to] feel [she is not] free to terminate the encounter." *May v. City of Nahunta*, 846 F.3d 1320, 1327 (11th Cir. 2017) (citations and internal quotation marks omitted). A seizure is unreasonable when "the circumstances, viewed objectively, [do not] justify" it. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis omitted) (citation and internal quotation marks omitted).

The district court ruled that Officer Phillips seized Marbut when he "prevented her from leaving . . . to go to the restroom" and that the other officers joined the seizure when they "physically restrained" her. The officers do not dispute these rulings. In both instances, the show of authority and physical force applied by the

officers made clear that Marbut was not "free to terminate the encounter." *May*, 846 F.3d at 1327 (citation and internal quotation marks omitted).

Although Marbut can prove a seizure, she cannot prove that the officers seized her "in violation of [her] clearly established [Fourth Amendment] rights." *Ingram*, 30 F.4th at 1250. "To be clearly established, a right must be well-established enough that every reasonable official would have understood that what he is doing violates that right." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (citation and internal quotation marks omitted). In other words, the officers are entitled to qualified immunity if it is at least "arguable" that a seizure was permissible. *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020) (citation and internal quotation marks omitted); *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).

We affirm on two separate grounds. First, the officers had an arguable basis to seize Marbut under the emergency-aid doctrine. Second, the officers alternatively had probable cause to believe that she had committed a crime.

### 1. The Officers Had an Arguable Basis to Seize Marbut under the Emergency-Aid Doctrine.

Police officers ordinarily execute searches and seizures in connection with suspected crimes. But the Fourth Amendment also permits officers to search and seize in response to non-criminal emergencies. In *Brigham City*, for example, the Supreme Court held

that "law enforcement officers may enter a home without a warrant" when they have "an objectively reasonable basis for believing" that an occupant needs "emergency assistance." 547 U.S. at 403, 406. This "emergency aid doctrine" reflects the common-sense principle that "preserv[ing] life or avoid[ing] serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* at 401, 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

Some emergency-aid cases involve "[m]ental-health seizures." *Ingram*, 30 F.4th at 1250. We have stated that these seizures comply with the Fourth Amendment when officers "have probable cause to believe [a] person is dangerous either to himself or to others." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011). And we have applied this standard to seizures conducted inside and outside of the home. *See Ingram*, 30 F.4th at 1247–50 (reciting probable-cause standard where officers stopped a suicidal plaintiff in "a cotton field behind [his] house" and applied force when they "reached the yard"); *May*, 846 F.3d at 1325–28 (reciting probable-cause standard where officer seized an unstable plaintiff "in her bedroom").

The district court ruled there was "probable cause to execute a mental-health seizure" because the officers had sufficient reason to believe that Marbut "would be endangering herself" if she "left the scene without treatment." The parties dispute whether that conclusion is consistent with our precedents. But the Supreme Court recently abrogated the probable-cause standard employed by those precedents.

Shortly before oral argument in this appeal, the Supreme Court held in *Case v. Montana* that "probable-cause decisions" do not apply to "emergency-aid situations." 146 S. Ct. 500, 507 (2026). The petitioner in *Case* faced charges for assaulting a police officer after officers entered his home without a warrant to perform "a welfare check on a suicidal male." *Id.* at 504 (citation and internal quotation marks omitted). The petitioner argued that the trial court should have suppressed "all evidence obtained as a result of the home entry" because the officers lacked "probable cause to believe [he was] seriously injured or imminently threatened with such injury." *Id.* at 504, 507 (citation and internal quotation marks omitted). But the Supreme Court declined "to put a new probable-cause spin" on the emergency-aid doctrine. *Id.* at 507. Because "[t]he probable-cause standard . . . is peculiarly related to criminal investigations," it is not appropriate "in the non-criminal, non-investigatory setting" when officers intervene to provide emergency assistance. *Id.* (citation and internal quotation marks omitted). The proper standard in that setting is instead the inquiry established by *Brigham City*: whether "officers ha[ve] . . . an 'objectively reasonable basis for believing' that their intervention [is] needed to prevent serious harm." *Id.* at 508 (quoting *Brigham City*, 547 U.S. at 400).

"Although we acknowledge the strength of the prior panel precedent rule in this circuit, the decision in [*Case*] is clearly on point and has undermined our precedent to the point of abrogation." *United States v. Lopez*, 562 F.3d 1309, 1312 (11th Cir. 2009) (alterations adopted) (citation and internal quotation marks omitted). Our prior caselaw directly conflicts with *Case* by imposing a

probable-cause requirement even though the purpose of mental-health seizures is not "to investigate suspected criminal activity." *Roberts*, 643 F.3d at 905. We imported the probable-cause requirement from two out-of-circuit decisions, both of which involved a "welfare check" in response to reports of a possible suicide attempt. *See id.* (first citing *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 328, 334 (4th Cir. 2009); and then citing *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)). *Case* clarified that the standard in that scenario is objective reasonableness, not probable cause. 146 S. Ct. at 504, 507.

That *Case* addressed a warrantless entry into a home instead of a seizure outside of the home does not make it any less controlling. *Cf. Lopez*, 562 F.3d at 1312–13 (holding that intervening Supreme Court decision "govern[ed] whether the time limit for filing a notice of appeal is jurisdictional even though [it] addressed a different subsection of the same rule of procedure"). The Supreme Court has explained that "[t]emporarily keeping a person from entering his home . . . is considerably less intrusive than police entry into the home itself." *Illinois v. McArthur*, 531 U.S. 326, 336 (2001). *Case* reaffirmed that principle by "respect[ing] as ever the 'first among equals' status the Fourth Amendment affords the home." 146 S. Ct. at 507 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). Because officers under *Case* can intrude upon the sanctity of the home when they have an "objectively reasonable basis for believing" that intervention is needed to "prevent serious harm," *id.* at 508 (citation and internal quotation marks omitted), the Fourth

Amendment necessarily affords officers the same power when executing emergency seizures outside the home, *United States v. Toussaint*, 838 F.3d 503, 508 (5th Cir. 2016). Our precedents imposing a probable-cause requirement in emergency-aid situations are "no longer good law." *Lopez*, 562 F.3d at 1311.

Applying the *Case* standard, the officers are immune if it is "arguable" that they had an objectively reasonable basis to conclude that seizing Marbut was necessary to avoid serious harm. *Alston*, 954 F.3d at 1318 (citation and internal quotation marks omitted). The objective-reasonableness standard is less demanding than probable cause, *see Case*, 146 S. Ct. at 507, which itself "is not a high bar," *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022) (citation and internal quotation marks omitted). We evaluate "[t]he objective reasonableness of an officer's conduct" by "looking at the totality of the circumstances." *Case*, 146 S. Ct. at 508 (citation and internal quotation marks omitted). We should not "oversimplif[y] a complex situation" with the benefit of hindsight. *Id.* Nor should we ignore "the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002) (citation and internal quotation marks omitted). As in other Fourth Amendment cases, officers responding to an emergency are not "required to sift through conflicting evidence or resolve issues of credibility" in the heat of the moment. *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) (citation and internal quotation marks omitted). "People could well die in emergencies if police

tried to act with the calm deliberation associated with the judicial process." *Holloway*, 290 F.3d at 1340 (citation omitted).

It is at least arguable that the officers could seize Marbut in accordance with these principles. Binding precedent holds that the emergency-aid doctrine justifies Fourth Amendment intrusions when necessary "to assist a drug overdose victim." *United States v. Brand*, 556 F.2d 1312, 1314, 1318–19 (5th Cir. 1977) (Wisdom, J.). And a reasonable officer on the scene could conclude that Marbut needed emergency assistance following a suspected overdose. Indeed, Marbut concedes that the officers were "entitled to believe" her mother's statement that she might have overdosed on GHB. She also conceded in the district court that a GHB overdose "usually requires emergency medical treatment." Those concessions, coupled with on-site observations that Marbut was unconscious in the Jeep and could not answer basic questions for several minutes, support an emergency-aid seizure.

To be sure, Marbut later showed some signs of improvement. She eventually remembered her name, address, and birthday, which prompted Pitts to opine that she was "sound of mind." Pitts also stated that "if she can tell us who she is and answer all our questions properly [then] technically we are not allowed to take her." But denying the officers qualified immunity based on those details would require us to "oversimplif[y] a complex situation." *Case*, 146 S. Ct. at 508.

Marbut still could not remember her birth year. Nor was there a definitive medical consensus that it was safe for her to leave

the scene when she abruptly announced her intent to go inside. Pitts had stated four minutes earlier that Marbut had no choice but to go to the hospital. Then, less than a minute before Marbut's attempted departure, another medic suggested that Marbut still needed attention when he informed the officers that he wanted to "get her up to the truck and check her out."

Extended observation of Marbut "might eventually" foreclose a reasonable belief that she required emergency assistance. *Prado Navarette v. California*, 572 U.S. 393, 403 (2014). But "the [brief] period in this case hardly sufficed in that regard." *Id.* at 403–04 (holding that officers did not lose reasonable suspicion of drunk driving when suspect drove more carefully for five minutes "after [his] vehicle was first spotted by an officer"). Considering "the need for a prompt assessment" of the "potentially serious consequences" if Marbut left without an examination and the "ambiguous information" available to the officers regarding the extent of her intoxication, *Holloway*, 290 F.3d at 1339 (citation and internal quotation marks omitted), seizing her was not unconstitutional "beyond debate." *Gates*, 884 F.3d at 1303.

Marbut alternatively suggests that her seizure was unlawful because Georgia's mental-health statute prevents a peace officer from transporting "a mentally ill person" to a physician or hospital for "involuntary treatment" unless "the person is committing a penal offense" or "the peace officer has consulted . . . with a physician [who] . . . authorize[d] the peace officer to transport the individual for an evaluation." GA. CODE ANN. § 37-3-42(a). But the officers

never transported Marbut to a physician or a hospital against her will. And the Fourth Amendment does not transform alleged violations of state law into constitutional violations. *See Daniels v. Williams*, 474 U.S. 327, 332 (1986); *Hughes v. Locure*, 166 F.4th 121, 131 (11th Cir. 2026) (Pryor, C.J., concurring). Marbut's state-law arguments do not overcome the officers' qualified immunity.

### 2. The Officers Had Probable Cause to Believe that Marbut Committed a Crime.

Even if the emergency-aid doctrine did not justify a seizure, the officers could seize Marbut because they had probable cause to believe she committed a criminal offense. We have long recognized that "any crime for which a reasonable policeman would have probable cause will support [an] arrest," whether or not an officer identified the crime in the moment. *United States v. Thomas*, 160 F.4th 1177, 1183 (11th Cir. 2025); *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010). It is a crime under federal and Georgia law to possess GHB. *See* 21 U.S.C. § 844(a); Hillary J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000, Pub. L. No. 106-172, § 3, 114 Stat. 7, 8–9; GA. CODE ANN. §§ 16-13-30(a), 16-13-25(5)(A). And Marbut conceded in her briefing that the officers were "entitled to believe" her mother's report about a potential overdose on GHB. Because "[p]robable cause does not require conclusive evidence and is not a high bar," *Washington*, 25 F.4th at 899 (citation and internal quotation marks omitted), the mother's report and the other information the officers collected at the scene authorized a seizure.

*B. Officer Phillips Enjoys Qualified Immunity*
*from the Excessive-Force Claim.*

A seizure that is lawful at its inception can become unlawful if an officer uses excessive force. *May*, 846 F.3d at 1330. Force is not excessive under the Fourth Amendment when it is "reasonably proportionate to the need for [it]." *Ingram*, 30 F.4th at 1251 (citation and internal quotation marks omitted). We evaluate proportionality by considering "the severity of the crime, the danger to the officer or others, and the risk of flight." *Id.* (alteration adopted) (citation and internal quotation marks omitted). More generally, we "consider[] the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the . . . officer." *Helm v. Rainbow City*, 989 F.3d 1265, 1273 (11th Cir. 2021). "[T]he only perspective that counts" for this analysis "is that of a reasonable officer on the scene at the time the events unfolded." *Id.* (citation and internal quotation marks omitted). "[W]e do not view an officer's actions with the 20/20 vision of hindsight," and "we make special allowance for them in tense, uncertain, and rapidly evolving situations." *Powell v. Snook*, 25 F.4th 912, 921 (11th Cir. 2022) (citation and internal quotation marks omitted).

Officer Phillips did not use excessive force. Because he could reasonably believe he had a right to seize and arrest Marbut, he had a concomitant "right to use some degree of physical coercion or threat thereof" to carry out the seizure. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Ingram*, 30 F.4th at 1251. Officer Phillips had only a

few seconds to calculate the appropriate response as Marbut abruptly turned toward him, announced that she was heading inside, and attempted to move past him in a confined space. A "reasonable officer on the scene at the time," *Helm*, 989 F.3d at 1273 (citation and internal quotation marks omitted), could perceive in this "rapidly evolving situation[]," *Powell*, 25 F.4th at 921 (citation and internal quotation marks omitted), that physically restraining Marbut was necessary to maintain the seizure.

Moreover, the method that Officer Phillips employed to restrain Marbut—grabbing her arm and pulling it behind her back—was "reasonably proportionate to the need." *Ingram*, 30 F.4th at 1251 (citation and internal quotation marks omitted). We have held that the use of *de minimis* force, "without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). And we have held that techniques similar to those used by Officer Phillips are *de minimis* forms of physical restraint. *See Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (explaining that "grabb[ing] [the plaintiff] by the arm, forc[ing] him to the ground, [and] plac[ing] him in handcuffs" was "no more severe than the force that we have described" as *de minimis* in prior cases); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (explaining that handcuffing technique used by officer who "grabbed [the] plaintiff's arm, twisted it around [his] back, [and] jerk[ed] it up high to the shoulder" was "a relatively common and ordinarily accepted non-excessive way to detain an arrestee"). We have also recognized that established examples of *de minimis* force do not cease to be *de minimis* when they

produce unexpected injuries. *See Rodriguez*, 280 F.3d at 1351 (finding *de minimis* force where handcuffing "caused the displacement of a key bone fragment" that required "amputation of the arm below the elbow").

Marbut acknowledges that "the Fourth Amendment permits officers to use some degree of physical coercion in performing an arrest or other permitted detention." And she offers no response to our precedents holding that similar uses of force were *de minimis*. Although Marbut insists that she "posed no danger to Officer Phillips" and did not flee, a reasonable officer in his position could interpret her sudden pivot in his direction and the extension of her arm toward his chest as a forceful attempt to "terminate the encounter" by entering her apartment prematurely. *May*, 846 F.3d at 1327 (citation and internal quotation marks omitted). Officer Phillips then used a standard handcuffing technique to restrain Marbut as she attempted to leave. And Officer Phillips could have handcuffed Marbut even without her break for the apartment because he had probable cause to believe that she unlawfully possessed GHB. *See Brown*, 608 F.3d at 735; *Rodriguez*, 280 F.3d at 1351.

Marbut's other arguments fare no better. She protests that Officer Pena told her she was "not in trouble." But "the existence of probable cause [to execute an arrest] is determined by objective standards and not on the basis of what police officers [subjectively] think." *Thomas*, 160 F.4th at 1183 (alteration adopted) (citation and internal quotation marks omitted). She also asserts that Officer Phillips acted excessively because he used a "Kimura arm lock" that

can break arms. Yet the police report she cites to support that proposition states that Officer *Pena* used the Kimura arm lock on her uninjured arm, and Marbut does not argue on appeal that Officer Pena deployed excessive force. Nor does the video footage reveal any use of force—Kimura arm lock or otherwise—that exceeds what our *de minimis* cases have described as "common and ordinar[y]." *Rodriguez*, 280 F.3d at 1351. Reviewing the totality of the circumstances as a reasonable officer would have perceived them, Officer Phillips did not use excessive force.

### C. The Other Officers Enjoy Qualified Immunity from the Intervention Claim.

"An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force . . . can be held liable for his nonfeasance." *Crenshaw v. Lister*, 556 F.3d 1283, 1293–94 (11th Cir. 2009) (citation and internal quotation marks omitted). Marbut alleges that Officers Cash, Collier, and Pena should have stopped Officer Phillips from using excessive force. But Officer Phillips acted reasonably. So the other officers "had no attendant obligation to intervene." *Id.* at 1294.

### IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of the officers.