Timothy C. Batten, Sr., United States District Judge
This case comes before the Court on the following motions:
• Plaintiff Kimberly Ellison's second motion [88] to amend her complaint;
• Ellison's motion [90] for partial summary judgment against Coweta County Fire Department Defendants Brandon Howard and Eric Gasaway (the "CCFD Defendants");
• Ellison's motion [93] for partial summary judgment against Newnan Police Department Defendants Kenneth Warren Hobbs, Michael D. Condit, and Patricia S. Ayers (the "NPD Defendants");
• NPD Defendants' motion [97] for summary judgment; and
• CCFD Defendants' motion [100] for summary judgment.[1]
I. Background
The following facts are undisputed.[2] Around 4:30 a.m. on June 16, 2015, Ellison's neighbor, Adrian Wiggins, placed a 911 call requesting emergency medical services.
*1334 According to the 911 call recording, Wiggins had grown increasingly concerned about Ellison's mental condition. She informed 911 dispatch that Ellison was bipolar and having a "manic breakdown." 911 Recording [98] at 0:12.
Wiggins requested an ambulance, explaining that she and Ellison's sister, Dawn Revere, had intended to take Ellison to the doctor later that morning when the office was open, but Ellison's mental state was deteriorating. She could wait no longer. In Wiggins's words, "She's not going to make it until in the morning, she's incoherent ... nothing she's saying is making sense." Id. at 1:02-08."
Wiggins indicated to the dispatcher that she was concerned that Ellison was "becoming combative" and that Ellison needed to go to the hospital "before this escalates into something, she needs to be medicated before this escalates into something." Id. at 1:10-20. Ellison admits that she was having a manic episode that night.
Ellison had a history of bipolar disorder, including a notable breakdown in 2004 that resulted in her involuntary commitment and treatment. This most recent incident began several days prior to the night Wiggins called 911. A few days before, she experienced bipolar symptoms following a stressful encounter at the county jail where she was detained while visiting an inmate. This initially caused her sister to become concerned about her mental state.
Over the next few days, Ellison experienced racing thoughts and sleepless nights. Though she tried to control them using meditation and calming techniques, her symptoms worsened. And even though she had medication, her deteriorating condition indicated that either she was not taking it properly or it was not working.
The night of the incident, Ellison reached out to her neighbors, visiting them at random intervals into the early hours of the morning. She asked some of her neighbors, including Wiggins, Rex Payne, and Roy Brown, to accompany her in her apartment. This happened through the course of the early morning, increasing Wiggins's concern for Ellison's mental state. Ellison's neighbors helped as best they could but had not seen Ellison break down to this degree.
Officers Hobbs and Condit arrived first on the scene. They met Wiggins outside the apartment building's entrance. She reiterated much of the information about Ellison's condition that she had given to the dispatcher. She mentioned that Ellison was "slowly spiraling" downward; "may or may not be combative"; and that Ellison needed to go to the hospital. [110-2] ¶¶ 24-25.
Paramedic Gasaway and EMT Howard arrived shortly thereafter, and the officers gave them an overview of the situation. The four of them, with Wiggins, proceeded inside Ellison's apartment.
Hobbs was in front and entered Ellison's apartment first, while the other three stood outside. Ellison greeted Hobbs with an excited hug, told him, "I'm in charge," and said, "I'm not crazy yet but I know where I'm headed because I broke down in 2004." Id. ¶ 28. Ellison was speaking rapidly and fleeting from subject to subject-while waiving around a grill lighter-with little coherence. During their exchange, Hobbs asked Ellison if she wanted to go to the hospital, and she said yes.
As the interaction with Hobbs unfolded, Gasaway attempted to obtain information about Ellison's medicine. But she grew agitated. She screamed, "Stop!" at Gasaway, and told Hobbs, "I'm going to get combative, that's why you're here." Id. ¶¶ 33-34. Intermingled with this Ellison *1335 continued reassuring the group that she was in control, but also repeatedly told Hobbs to "shut up" as he continued the conversation with her. Id. ¶ 35.
Ellison continued her erratic talking, rambling on about numerous, unrelated topics. Hobbs continued trying to get Ellison to prepare to go to the hospital and to get her medicine, but her interest soured and she ignored his pleas.
At this point, the parties dispute (primarily, the characterization of) what happened next, but the Court does not rely on their characterizations; instead, it relies on the body wearable cameras ("bodycams") worn by Hobbs and Condit.
Ellison had moved out into the hallway and stood talking among the group with unbroken rapidity. Hobbs was standing in the apartment entryway inside the doorframe. Growing agitated, Ellison confronted Hobbs, pointing at him. She then pushed past him while moving towards Payne, who was inside the apartment. As she moved past him, Hobbs grabbed her from over her shoulder and restrained her from behind by her arms. Ellison yelled louder and louder with continued incoherence while resisting Hobbs's grip. Together, the pair waddled into the hallway, all while Hobbs was asking Ellison to calm down and trying to explain to her why the officers were there. Ellison was wearing only a bathrobe at this time. Due to Hobbs's grasp on her arms and the sleeves of her robe, one of her breasts was briefly exposed, but was covered up after a few seconds. Then, Ellison abruptly calmed down, so Hobbs gently released her and continued trying to speak with her.
The facts continue from here undisputed. After more disconnected discussion with the group, Ellison retreated into her apartment and slammed the door with the officers and EMS outside. Wiggins exited the apartment, leaving the door slightly ajar. Payne followed Wiggins out shortly thereafter, explaining that Ellison was getting upset when he tried to get her to go willingly to the hospital. While in the hallway the group discussed the risks of what would happen if Wiggins was left to care for Ellison by herself, especially if Ellison's condition continued to worsen. They agreed that it was too risky to drive Ellison in a normal passenger vehicle when her behavior was unpredictable and manic.
After a few minutes of everyone standing in the hallway, Ellison and Hobbs communicated through the ajar door. Ellison then invited him inside and said they needed to "learn to trust each other." Hobbs bodycam-1 [98] at 18:25. Gasaway followed, and after Hobbs explained that he was there to help, she allowed him in. She was still talking disconnectedly-constantly referring to her "advanced directive" as both a document and one of the people in the room-but showed Gasaway her medications and around her kitchen while asking Brown if he was packing her bag.
Around this time, Sergeant Ayers arrived on the scene. Officer Condit met her out front of the apartment and briefed her on the unfolding situation. He informed Sergeant Ayers that Ellison is bipolar, that things were likely "escalating to a combative state," Condit bodycam-1 [98] at 20:24-26, and that EMS had prepared soft restraints in anticipation that she should be taken into the hospital.
When Sergeant Ayers approached the apartment, Ellison greeted her with a warm welcome. Howard entered the apartment with Condit and Sergeant Ayers and joined the rest of the group. Ellison was still chatting endlessly about disparate topics, and when asked by Officer Hobbs whether she would go to the hospital she said, "No." Ayers bodycam [98] at 2:24.
*1336 Ellison continued, breathlessly active, and began to give passwords for her electronic devices. As she moved around the apartment, talking, and bustling, Ayers asked Gasaway what was going on. He replied, "We're gonna have to forcibly take her. That's all there is to it." Id. at 2:46-48. Howard can be seen at this time preparing the soft restraints while Ellison walked around chatting about a variety of topics upon which she had become affixed.
Ellison then sat down on the couch. Even though there was little actual conversation taking place, Ellison asked that everyone be quiet so that she could have a moment. Yet she kept talking. She switched topics again, calling herself "the Queen," id. at 3:18, and analogizing herself to a woman in labor.
Ellison then hopped up from the couch as one of the Defendants attempted to collect some of her belongings. She continued talking, let out a "Damn!" and stated that she does not cuss unless she is manic. Id. at 3:47. She then admitted without missing a beat, "I'm a sex addict." Id. at 3:55. She began discussing her boyfriend, at which point Sergeant Ayers attempted to speak with her. Ellison then screamed, "Stop! Stop! Stop!" emphatically. Id. at 4:04. She continued explaining that she is a sex addict and about other intimate matters, then moved on to giving instructions for the care of her dog, Oscar.
The disconnected discourse continued while Ellison moved back to the couch. While EMS began preparing the soft restraints, Sergeant Ayers can be heard stating to EMS, "Do what you got to do." Id. at 5:11. Howard and Gasaway approached Ellison and said, "It's time for us to go" and reached for her arms (she was holding a pad of paper in one hand). Id. at 5:16. As they reached for her, Ellison yelled and began flailing against the soft restraints. Ellison continued yelling, "Stop!" She yelled for someone to call her dad and then told the EMS, "I'm calm, I'm calm" and asked them to "take my pulse, take my pulse." Id. at 5:27-30.
Ellison became extremely agitated again and continued to yell and scream. She then stated, "I'm gonna punch somebody in a minute." Id. at 5:45. Ayers replied, "No you're not." Id. at 5:47. Ellison admitted that she was talking out her present feelings so that they knew how she was feeling inside.
Ellison stated that she understood that she might be under arrest, but the officers reassured her that she was not, that they were there to help and were going to take her to the hospital. She replied, "Okay. Okay." Id. at 5:59-6:02. She began to calm down, stating that she wanted to be quiet, but then she suddenly resumed yelling and screaming again. During this time Howard and Gasaway were carefully applying the soft restraints while Officer Hobbs held Ellison's knees (she had been flailing and exposing herself from under her robe).
Ellison released herself onto her back on the couch, and then Sergeant Ayers said, "Let's get her out of here ASAP." Id. at 6:47. Gasaway and Howard guided her off the couch and walked her out of the apartment. She was generally compliant, though she still talked loudly and incoherently. She did, however, walk out under her own power. At the doorway there was a scuffle regarding which shoes Ellison wanted to wear, and she eventually found the ones she wanted. She also said that she needed to get dressed. After Gasaway stated that she already had the chance to do so, she instructed one of the neighbors to pack her bag.
After Ellison was in the hallway of the building, she began yelling and screaming again. Sergeant Ayers noted that Ellison needed to get out of there and to the *1337 hospital because Ellison was "up and down." Id. at 8:01. Sergeant Ayers remarked that at least part of the reason she was being taken to the hospital was to help get her medicine straightened out.
Gasaway and Howard walked Ellison out while she continued, intermittingly yelling and talking, discussing the possibility that she missed her medicine. They walked her outside to the ambulance. Outside, one of Ellison's friends, Ian Johnson, was waiting. Ellison referred to him as "advanced directive" and asked him to perform a number of tasks, including getting in the ambulance with her.
Howard and Gasaway helped Ellison climb into the ambulance. Once she got to the stretcher, she told them that she knew what to do and that she was "gonna help" get in because she knows how. Condit bodycam-1 [98] at 28:56.
Ellison's conversation continued breathlessly and with disconnected thoughts. She stated that she needed to take her medicine at 8:00, but Officer Condit informed her that it was only 4:30 in the morning. Ellison replied that it would knock her out, and Officer Condit told her that all would be taken care of when she arrived at the hospital. Howard and Gasaway buckled Ellison into the stretcher and transported her to Piedmont Newnan Hospital. They assessed her vitals prior to transport. Her blood pressure was dangerously high, reading 205/119.
Once at the hospital, EMS transferred Ellison's care to the hospital staff. She was seen at the emergency room by Dr. Gottfrid Karlsson. At the hospital, she continued her erratic behavior, including banging on the windows and doors attempting to leave. Dr. Karlsson determined that Ellison needed to be admitted involuntarily and executed a Form 1013 order for psychiatric evaluation. She was then transferred from Piedmont Newnan to Summit Ridge Hospital, from which she was later released.
Ellison now brings suit against Defendants for alleged violations of federal and state law arising from the June 16 incident. She brings the following claims under 42 U.S.C. § 1983 for violation of the U.S. Constitution: against the NPD Defendants for violating her Fourth Amendment right to be free from unreasonable seizure (counts 1 and 5) and her Fourteenth Amendment right to due process (count 2 and 6); against the CCFD Defendants for violations of her Fourth Amendment right to be free from unreasonable searches and seizures (counts 3 and 7) and Fourteenth Amendment right to due process (count 4 and 8); and against Sergeant Ayers alone for a violation of the Fourth and Fourteenth Amendments by failing to properly supervise Hobbs and Condit (count 9). She also seeks attorneys' fees (count 10) and alleges a number of state law claims (counts 11 through 16).
The NPD and CCFD Defendants have moved for summary judgment on all counts against them. Ellison cross-moves for partial summary judgment against the CCFD Defendants on counts 3 and 7 and against the NPD Defendants on counts 1 and 5.
II. Legal Standard
Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FindWhat Inv'r Grp. v. FindWhat.com , 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *1338 Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." Id. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." Id.
"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." Id. (citing Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. United States v. Four Parcels of Real Prop. , 941 F.2d 1428, 1437-38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id. at 1438 (citing Celotex Corp. , 477 U.S. at 331, 106 S.Ct. 2548 ). The second is to show that "there is an absence of evidence to support the nonmoving party's case." Id. (quoting Celotex Corp. , 477 U.S. at 325, 106 S.Ct. 2548 ).
If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. Id. At this point, the nonmoving party must " 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc. , 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp. , 477 U.S. at 324, 106 S.Ct. 2548 ).
"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." S. Pilot Ins. Co. v. CECS, Inc. , 52 F.Supp.3d 1240, 1242-43 (N.D. Ga. 2014) ; Mobile Cty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc. , 567 F.Supp.2d 1342, 1348 (S.D. Ala. 2008) ("The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." (quoting Godard v. Ala. Pilot, Inc. , 485 F.Supp.2d 1284, 1291 (S.D. Ala. 2007) ) ).
In this case, most of the disputed facts are recorded on one of three body cameras ("bodycams") worn by the NPD Defendants. This affects how the Court will view the allegedly disputed facts. "Although [the Court] do[es] view the facts and draw reasonable inferences in [the non-movant's] favor, the Supreme Court has instructed us that when there is a reliable video recording of disputed events, we are to view facts 'in the light depicted by the video[ ].' " Davidson v. City of Opelika , 675 F. App'x 955, 957 (11th Cir. 2017) (some alterations in original) (quoting Scott v. Harris , 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ); see also Estate of Collins v. Wilburn , No. 16-68-HRW, 2017 WL 4111414, at *5 (E.D. Ky. Sept. 15, 2017) ("[T]here is a wrinkle in this case pertaining to the factual record: the events in question were captured on ... body cam.... Therefore, the standard of review for this case is a little different, '[w]here a police dash-cam (or in this case, a body cam) depicts all of the genuinely disputed facts, we view the facts in the light depicted by the videotape.' " (last alteration in original) (quoting Scott , 550 U.S. at 381, 127 S.Ct. 1769 ) ).
III. Discussion
Defendants raise the affirmative defense of qualified immunity. "Qualified *1339 immunity protects government actors performing discretionary functions from being sued in their individual capacities." May v. City of Nahunta , 846 F.3d 1320, 1327 (11th Cir. 2017) (quoting Holmes v. Kucynda , 321 F.3d 1069, 1077 (11th Cir. 2003) ). "In evaluating a government actor's entitlement to qualified immunity, the Supreme Court has developed an objective-reasonableness test wherein 'the official's actions must be evaluated against "clearly established law," consisting of statutory or constitutional rights that a reasonable person should have known.' " Id. (quoting Courson v. McMillian , 939 F.2d 1479, 1487 (11th Cir. 1991) ).
To enjoy qualified immunity, the defendant-official bears the burden to show that he was acting within his discretionary authority.
[O]nce [the Court] determine[s] that a defendant was acting within his discretionary authority at the time of the challenged conduct, we engage in a two-prong analysis to evaluate whether he is entitled to qualified immunity. First, we consider whether the facts-viewed in the light most favorable to the plaintiff-establish that a constitutional right has been violated. Second, we determine whether that right was clearly established at the time of alleged conduct. "Both elements of this test must be satisfied for an official to lose qualified immunity, and this two-prong inquiry may be done in whatever order is deemed appropriate for the case."
Id. (citations omitted) (quoting Grider v. City of Auburn , 618 F.3d 1240, 1254 (11th Cir. 2010) ).
A. Summary Judgment-CCFD Defendants
The CCFD Defendants argue that Ellison's claims against them should be dismissed because they are entitled to qualified immunity. Ellison counters that partial summary judgment should be entered in her favor on her Fourth Amendment claims (Counts 3 and 7 of her amended complaint).
The parties' cross-motions raise the same question: whether there is a genuine issue of material fact that the CCFD Defendants are entitled to qualified immunity for their part in the allegedly unlawful seizure of Ellison's person the night she was transported to the hospital.
1. The CCFD Defendants Were Acting Within the Scope of Their Discretionary Authority
The CCFD Defendants have carried their burden of showing that they were acting within the scope of their discretionary authority. To be eligible for summary judgment on qualified immunity, the CCFD Defendants "must have been engaged in a 'discretionary function' when [they] performed the acts of which the plaintiff complains." Holloman ex rel. Holloman , 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ). The Court asks "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265. Whether a defendant-official is entitled to qualified immunity "is a question of law for the courts, even when asserted on summary judgment." Post v. City of Ft. Lauderdale , 7 F.3d 1552, 1557 (11th Cir. 1993).
To preclude qualified immunity, it is not enough to simply show that the official acted wrongly.
One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government *1340 official's authority or power.... "[But] the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act...." In applying each prong of [the discretionary function] test, [courts] look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.
Holloman , 370 F.3d at 1266 (citation omitted) (quoting Harbert Int'l, Inc. v. James , 157 F.3d 1271, 1282 (11th Cir. 1998) ).
Thus, it is important to define the defendant-official's conduct at the appropriate level of generality.
If framed too narrowly, such as whether it was within a defendant's discretion to violate a plaintiff's constitutional rights, "the inquiry is no more than an untenable tautology." If framed too generally, such as whether it was within a defendant's discretion to perform acts to further the public interest, then every act performed by a government employee would qualify. The test developed by [the Eleventh Circuit] is to characterize a government official's actions "at the minimum level of generality necessary to remove the constitutional taint."
Kjellsen v. Mills , 209 F. App'x 927, 929 (11th Cir. 2006) (citations omitted) (first quoting Holloman , 370 F.3d at 1266 ; and then quoting id. ).
The Court finds it appropriate, based on the alleged violations, to define the CCFD Defendants' conduct as restraining patients with soft restraints and determining whether a patient needs to be transported to a hospital. The Court finds that the record supports the conclusion that, at this level of generality, the CCFD Defendants did indeed act within the scope of their discretionary authority.
As a general matter, it is fairly obvious that the CCFD Defendants' job-related function includes restraining patients and transporting them to the hospital, even when the transport is alleged to be involuntary. Exhibit B to Gasaway's affidavit [100-14] is a copy of the CCFD's Standing Orders and Protocols ("SOPs"), which advises that "all patients seeking 911 services be transported to the hospital for evaluation when medically necessary," id. at 23, and outlines the situations when such transport may be refused.
Under the SOP, "Any patient ... may refuse transport of self ... if they demonstrate adequate medical decision making capacity." Id. An implication of this is that if a patient does not demonstrate adequate medical decision making capacity, she may not refuse transport service. And from this, it must be inferred that the medical personnel on scene (including the paramedic and EMT) have the authority to determine whether a patient has this capacity. Similarly, the SOP contemplates a justified use of physical restraints-so-called "soft restraints" like the type used here-in certain situations. See id. at 25.
The SOPs govern ambulance personnel pursuant to Georgia statutes and regulations pertaining to ambulances and emergency medical services. Georgia law authorizes the Department of Public Health ("DPH") "to adopt and promulgate rules and regulations for the protection of public health" with respect to ambulance transport, conditions, and training. O.C.G.A. § 31-11-5(a). It further provides for ambulance service medical directors, or regional directors, in conformance with DPH regulations, to prescribe protocols for emergency services personnel, particularly those attached to ambulance services like Howard, an EMT, and Gasaway, a paramedic.
*1341 See O.C.G.A. § 31-11-60.1(b), (c). EMTs and paramedics are generally required to comply with these protocols. Id. § 31-11-60.1(c).
The SOPs are one such protocol overseen by the medical director assigned to the CCFD. See [100-14] at 20. One of their consistent themes is that while they are guidelines for action, the "judgment of the provider's [sic] on-scene remain sovereign." Id. This discretion vested in the on-scene provider is a central consideration in the Court's conclusion that the CCFD Defendants were performing a job-related function. The whole episode required tremendous discretion. The Court's conclusion furthers the purpose of qualified immunity, that is, that public officials performing their official duties in rapidly changing environments facing unascertainable risks are not held to too high a standard in the post-hoc reviews of a federal tribunal. See Foy v. Holston , 94 F.3d 1528, 1534 (11th Cir. 1996) ("When public officials do their jobs, it is a good thing. Qualified immunity is a real-world doctrine designed to allow local officials to act (without always erring on the side of caution) when action is required to discharge the duties of public office. For many public servants, a failure to act can have severe consequences for the citizenry." (citation omitted) ). Therefore, the Court concludes that the CCFD Defendants were performing a job-related function when they assessed, restrained, and transported Ellison to the hospital.
Ellison asserts that the CCFD Defendants have failed to demonstrate that even if they were performing a job-related function, they did not do so through means available to them. She argues that the CCFD Defendants failed to comply with certain established protocols for the transport of mentally ill patients, under both Georgia law and the SOP. She argues that these rules specifically prescribe the means that EMS may use to transport mentally ill patients and that failure to follow these set procedures means that the Defendants were not acting through legitimate means because the procedures set limits on means by which they could perform their job duties.
The Eleventh Circuit rejected a similar contention in C.C. ex rel. Andrews v. Monroe County Board of Education , 299 F. App'x 937 (11th Cir. 2008). A minor student sued a school principal for constitutional violations arising from alleged sexual harassment by one of her teachers (whom the defendant-principal supervised) based on his failure to intervene, report, or investigate the assault when it came to his attention. The plaintiff argued that the principal was not entitled to qualified immunity because he was not acting within his discretionary authority due to his failure to follow the school's protocol for reporting and investigating sexual harassment.
The trial court denied qualified immunity, but the Eleventh Circuit reversed. The court held that the defendant-principal was entitled to qualified immunity "even for ministerial actions," id. at 940, i.e., where his discretion to act had been curbed by a school policy, and "even if [the principal] did not do all that was required of him." In other words, the federal qualified-immunity analysis does not rise or fall on whether a public official strictly complied with applicable procedures or protocols.
The situation here is similar. Even if the Court were to accept that the CCFD Defendants failed to comply with the SOPs, the Court finds that it was "within the perimeter" of their job description to use soft restraints and transport Ellison to the hospital based on their conclusion that she lacked adequate medical decision making capacity. Id. at 941. And it is within their *1342 job description to perform these functions even though they "did not do all that was required of [them]" by their own policies. Id. As this Court has put it before, it is within the CCFD Defendants' " 'arsenal' of powers" to determine whether a person should be transported the hospital, even if the ultimate decision is allegedly unlawful, just as it was within the perimeter of the principal's authority in Andrews to report sexual abuse-even if he did it wrongly or at the wrong time, or not at all. Williams v. Hudson , No. 1:11-cv-3542-SCJ, 2013 WL 11927707, at *7 (N.D. Ga. Aug. 12, 2013).[3]
Thus, unless the CCFD Defendants' actions were clearly outside the "perimeter" of their job description and the means available to them, the Court must conclude that they acted within their discretionary authority.
Even forgetting the foregoing, Ellison's arguments also fall short because it is not entirely clear that the CCFD Defendants actually violated the SOP. As noted earlier, under the SOP the on-the-ground provider (here, the paramedic and EMT) are given discretion to make decisions about patient care. Under DPH regulations, "Control of patient care at the scene of an emergency shall be the responsibility of the individual in attendance most appropriately trained and knowledgeable in providing prehospital emergency care and transportation." GA. COMP. R. & REGS. 511-9-2-.07(6)(i).
In this situation, the responsible individual would have been Gasaway, as paramedic, and next Howard, as EMT. This is consistent with Howard's deposition.
Q. Did you make the decision to transport her?
A. We made that decision.
Q. You say 'we.' Who is 'we'?
A. The Paramedic. The Paramedic basically has the final say-so. We assessed the situation together.
Q. So the Paramedic on the scene here was Mr. Gasaway?
A. Yes.
Q. And you were basically his assistant?
A. Yes.
Q. So he was in charge?
A. The Paramedic has the-yes, they're basically in charge.
Q. He has a superior rank than you do?
A. Yes.
Q. You decided at some point to use restraints on Ms. Ellison; is that correct?
A. Yes.
Q. Who made that decision?
*1343 A. Again, that was a decision we made together for her safety and for others.
Howard Depo. [78-1] at 14:25-16:20 (emphasis added) ).
Ellison contends that the SOP required the CCFD Defendants to call medical control prior to restraining her and taking her involuntarily to the hospital, yet they did not. However, the procedures for contacting medical control are either permissive or leave room for the provider on the scene to act without medical control, particularly where the on-scene providers have no question about what they need to do. And under these facts, the CCFD Defendants have made it clear that they had no question that they needed to transport Ellison to the hospital due to her condition. In the absence of uncertainty, contacting medical control was not-as Ellison contends-mandatory. Rather, the CCFD Defendants were exercising their sovereign, on-the-ground provider judgment, which is consistent with the standards required by the SOPs.
Ellison also asks the Court to hold that the CCFD Defendants were acting through unlawful means because they took her to the hospital without complying with Georgia's statutory procedures for involuntary mental examinations, see O.C.G.A. § 37-3-40 et seq. The Court finds two problems with this theory.
First, none of the cases Ellison cites is against emergency medical personnel or holds them liable for failure to comply with these provisions of Georgia law. Simply put, the Code requires certain procedures before a person can be transferred to a designated mental health receiving facility for a mental evaluation. These procedures include a physician's certification or a court order before a person may be involuntarily admitted. Georgia courts have required "strict compliance" with these procedures. Boatright v. State , 327 Ga.App. 785, 761 S.E.2d 176, 180 (2014). The Code sections are, however, silent about what role, if any, emergency services plays in this procedural scheme.
The Georgia courts' interpretation of these provisions appears to contemplate some reasonable amount of time where a person may be detained against her will prior to the initiation of the procedures. For example, the time needed for the doctor to examine the patient to ascertain whether involuntary treatment is warranted may well involve a period of unwanted detention before the certification issues allowing for involuntary treatment. See Kendrick v. Metro. Psychiatric Ctr., Inc. , 158 Ga.App. 839, 282 S.E.2d 361, 364 (1981) (discussing the "time limits for the steps leading to treatment"). This time can be no more than is necessary for the purpose of conducting initial interview(s). See id. ("[T]he elapsed time between the patient's arrival at the first doctor's office or at the hospital and the onset of involuntary psychiatric treatment could be no more than the time occupied by two interviews."); Heath v. Peachtree Parkwood Hosp., Inc. , 200 Ga.App. 118, 407 S.E.2d 406, 407 (1991) ("[A]ppellant could not be lawfully detained against her will during the entire three-day period for the purpose of determining whether she should eventually be certified for involuntary mental examination and treatment pursuant to OCGA § 37-3-40 et seq.").
Here, to get Ellison to a hospital where a doctor could perform an appropriate examination (which eventually occurred) some delay attendant in the steps leading to treatment is inevitable to begin the process outlined in the statute. This could reasonably include assessment and transport by emergency medical services to a physician for a medical examination. And here, under the foregoing cases, the bodycam *1344 evidence leads the Court to find that the length of detention for this purpose would not be unreasonable.
Second, even if the CCFD Defendants had entirely failed to comply with the mandatory involuntary treatment procedures, this would not be fatal to their discretionary authority argument. Andrews teaches that the failure to comply with applicable procedures or protocols does not ipso facto mean that a public official utilized means that were not within his power. Instead, qualified immunity is concerned with the "general nature of the defendant's action" and does not make the inquiry at too specific a level of generality. Andrews , 299 F. App'x at 940. Here, the Court reiterates its conclusion that the general nature of the CCFD Defendants' job includes using soft restraints and making medical transport decisions.
In sum, the Court concludes that the CCFD Defendants were acting within the scope of their lawful authority.
2. Ellison Has Not Demonstrated a Violation of Clearly Established Law
Having determined that the CCFD Defendants were acting within the scope of their discretionary authority, the burden shifts to Ellison, and the Court "engage[s] in a two-prong analysis to evaluate whether [the official] is entitled to qualified immunity." May , 846 F.3d at 1327.
"First, we consider whether the facts-viewed in the light most favorable to the [non-moving party]-establish that a constitutional right has been violated. Second, we determine whether this right was clearly established at the time of alleged conduct." Id.
Once again, these analyses may be undertaken in either order. Id. Ellison contends that the CCFD Defendants have violated her Fourth Amendment right to be free from unreasonable seizures and her Fourteenth Amendment right to due process. These are taken in turn.
a. No Violation of the Fourth Amendment
"The Fourth Amendment protects people from unreasonable searches and seizures." Roberts v. Spielman , 643 F.3d 899, 905 (11th Cir. 2011). "In the context of a mental-health seizure '... the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to himself or to others.' " May , 846 F.3d at 1327-28. Only arguable probable cause is required. " '[T]o be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause, only "arguable probable cause' "-that is, 'the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.' " Id. at 1328 (quoting Montoute v. Carr , 114 F.3d 181, 184 (11th Cir. 1997) ).
In May , the Eleventh Circuit considered several factors important to the decision that the officer had probable cause to conduct a mental-health seizure: the officers were responding to a 911 call; they had been given statements by the plaintiff's relative about her bipolar condition and past history of self-harm tendency; and there was no indication that the information given was untrustworthy.
The Court finds that, like the plaintiff in May , Ellison has not carried her burden of showing that there is no genuine issue of material fact that the CCFD Defendants had at least arguable probable cause that Ellison presented a danger to herself or others.[4] In the initial 911 call, Ellison's *1345 neighbor reported to the dispatcher that she was concerned that Ellison would become combative, and Ellison admitted this herself, even once saying that she would hit somebody. This type of behavior punctuated the entirety of the CCFD Defendants' interaction with her after arriving on scene.
And just as in May , the CCFD Defendants were similarly responding to a 911 call, were informed of Ellison's mental-illness history and recent statements indicating a possibility that she would harm herself or others, and witnessed this behavior continuing when they arrived (i.e., the information proved reliable). Accordingly, the Court holds that they had at least arguable probable cause for the seizure, and therefore no Fourth Amendment violation occurred.
b. No Violation of the Fourteenth Amendment Due Process Clause
Ellison also argues that her Fourteenth Amendment right to due process was violated when the CCFD Defendants transported her to the hospital without following the state-prescribed procedures for involuntary mental evaluation in O.C.G.A. § 37-3-40 et seq.
"A procedural due process claim has three elements '(1) a deprivation of a constitutionally-protected liberty or property interest; (2) [government] action; and (3) constitutionally-inadequate process.' " Alvarez v. U.S. Immigration & Customs Enf't , 818 F.3d 1194, 1228 (11th Cir. 2016) (alteration in original) (quoting Grayden v. Rhodes , 345 F.3d 1225, 1232 (11th Cir. 2003) ). The CCFD Defendants challenge neither the existence of a constitutional deprivation[5] nor the fact that this deprivation was accomplished through government action. Accordingly, the Court addresses only whether this deprivation was accomplished using constitutionally inadequate process.
"Due process is a flexible concept that varies with the particular situation." Cryder v. Oxendine , 24 F.3d 175, 177 (11th Cir. 1994). To ascertain the procedural protections to which Ellison was entitled under the U.S. Constitution, the Court weighs competing interests:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Zinermon v. Burch , 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting Mathews v. Eldridge , 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ). These " Matthews [Mathews] factors" provide the background of any interest-weighing in a procedural due process challenge.
Generally, "some kind of a hearing" is required prior to the State's deprivation of a liberty interest. Id. But there are circumstances that justify a state's implementation of "a statutory provision for a post-deprivation hearing, or a common-law tort remedy for erroneous deprivation"
*1346 to satisfy due process. Id. at 128, 110 S.Ct. 975. These situations are often those "where a State must act quickly, or where it would be impractical to provide postdeprivation process ...." Gilbert v. Homar , 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). In these circumstances, an actionable due process violation does not occur until "the state refuses to provide a process sufficient to remedy the procedural deprivation ...." Ogburia v. Cleveland , 380 F. App'x 927, 929 (11th Cir. 2010).
Ellison argues that before restricting her liberty and transporting her to the hospital, the CCFD Defendants were required to provide her with pre-deprivation process and that the substance of the process due is found in O.C.G.A. § 37-3-40 et seq. The CCFD Defendants respond that Ellison was not entitled to pre-deprivation process and that her post-deprivation process was adequate to satisfy due process in these circumstances, and even if they were not, Ellison failed to show that she took advantage of them and found them constitutionally deficient. The Court agrees.
As an initial matter, the alleged deprivation Ellison complains about is factually distinguishable from the cases she cites to support her contention. She cites to Mills v. Rogers , 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), and the Eleventh Circuit's decision in Burch v. Apalachee Community Mental Health Services, Inc. , 840 F.2d 797 (11th Cir. 1988).
In Mills , the plaintiff alleged a procedural violation of the Fourteenth Amendment Due Process Clause because he was being involuntarily treated with antipsychotic drugs. The Burch plaintiff was confined for 152 days in the hospital without a hearing and treated with mind-altering drugs based on a voluntary treatment form he signed but claimed to have lacked adequate capacity to sign given his mental state at the time. Both of these plaintiffs were subject to significant and/or long-term deprivations of their physical liberty without adequate process.
Here, Ellison's asserted due process deprivation took place during the time between being placed in restraints and then taken to the hospital for examination. This was, at most, hours. Upon arrival at the hospital she received the requisite process due under the Georgia statutory scheme[6] because the doctor examined her, determined that she was in need of involuntary treatment, and executed a form[7] satisfying O.C.G.A. § 37-3-41. Thus, her deprivation in comparison to that in Mills and Burch is slight. Under the first prong in Mathews , this weighs against a finding that procedural due process was violated.
And when considering the Mathews factors, the government's interest is hefty when contrasted with the scale of Ellison's alleged deprivation. Both the State's police power and parens patriae interests are implicated. The former because it is necessary *1347 for the State to keep citizens safe when a mentally ill person could possibly cause harm-even if unintentional-to others. See Lynch , 744 F.2d at 1458. The latter is implicated because of the State's interest in protecting the person from causing harm to herself. Id. And when, as here, there is an emergency, the State's interest in a quick resolution justifies a temporary detention, so long as adequate post-deprivation remedies are made available. See Burch , 840 F.2d at 800 ("In limited cases where the countervailing state interests are met, due process permits a period of involuntary commitment prior to a hearing as long as a hearing is held shortly after the initial detention.").
There is a further distinction between Ellison's cited cases and this case. The circumstances under which Ellison was escorted to the hospital do not render it practicable, as contemplated in Gilbert , for the CCFD Defendants to provide a pre-deprivation hearing-even an extremely informal one. If anything, the minimum process required under the circumstances was the medical providers' determination that she needed to be taken to a hospital.
The situations involving first responders and the mentally ill are random and unpredictable. Examining its prior cases and Supreme Court precedent, the Eleventh Circuit noted that a pre-deprivation hearing is "practicable when officials have both the ability to predict that a hearing is required and the duty because of their state-clothed authority to provide a hearing." Id. at 802. In emergency situations like this one it is difficult for those public officials responding to 911 emergencies to predict that a hearing is necessary-much less actually provide one at all hours of the day and in the various reaches of their jurisdictions.
Because a pre-deprivation hearing in this instance would be impractical, the Court holds that Ellison was not entitled to a pre-deprivation hearing and that she had an adequate post-deprivation remedy in at least a few different forms. First, upon her arrival at the hospital she received an evaluation by a physician and form notifying her of her right to a habeas corpus proceeding under Georgia law, which also satisfies due process. She could also pursue state-tort-law causes of action against her alleged captors, which would in this instance satisfy due process. See Becker v. Kroll , 494 F.3d 904, 921 (10th Cir. 2007) ("The Supreme Court has held that where pre-deprivation remedies cannot anticipate and prevent a state actor's wrongful act, post-deprivation state tort remedies are adequate to satisfy due process requirements.").
Ellison has not argued that these state remedies are inadequate to redress the alleged deprivation or that she attempted to take advantage of them and found them wanting. This is fatal to her procedural due process claim. See Collier v. Conway , 672 F. App'x 950, 952 (11th Cir. 2016) ("[Plaintiff] cannot now rely on her own failure to take advantage of the available state remedies as the basis for her procedural due process claim."); Cotton v. Jackson , 216 F.3d 1328, 1331 (11th Cir. 2000) ("If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process.").
In conclusion, the CCFD Defendants are entitled to summary judgment based on qualified immunity.
B. Summary Judgment-NPD Defendants
The NPD Defendants move for summary judgment on all of Ellison's claims; Ellison moves for partial summary judgment on her Fourth Amendment *1348 claims (counts 1 and 5 of her amended complaint) against the NPD Defendants. The sections that follow will be notably shorter, as much of the foregoing analyses and conclusions are applicable to the NPD Defendants mutatis mutandis.
Like the CCFD Defendants, the NPD Defendants raise the defense of qualified immunity as to each of Ellison's alleged constitutional violations. As set forth above, the defense of qualified immunity requires first that the NPD Defendants show that they were acting within the scope of their discretionary authority. Then, the burden shifts to Ellison to demonstrate the violation of a clearly established constitutional right.
First, the Court holds that the NPD Defendants were acting within the scope of their discretionary authority. That is, they were "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [their] power to utilize." Holloman , 370 F.3d at 1265. Each of the police officers, acting as peacekeepers maintaining community safety, were responding to Wiggins's 911 call. This is a classic police activity and well within the officers' job description. Brigham City v. Stuart , 547 U.S. 398, 406, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ("The role of a peace officer includes preventing violence and restoring order."). They continued in this role throughout their encounter with Ellison.
The Court also finds that the officers did not use any means in the performance of their duties that were not within their power. Even if Ellison is correct that they unlawfully seized her, it is within the police's power to do so when stripped of the alleged unconstitutional taint. See Kjellsen , 209 F. App'x at 929. Therefore, the burden shifts to Ellison to demonstrate the violation of a clearly established constitutional right.[8]
Now, the Court may determine in whichever order it deems appropriate whether a constitutional right was violated or whether the right was clearly established at the time of the alleged deprivation. See Grider , 618 F.3d at 1254. Ellison first argues that the NPD Defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures. Next, she argues that they violated her Fourteenth Amendment right to due process. Finally, she argues that Sergeant Ayers failed to supervise Hobbs and Condit, which resulted in the alleged deprivations. The Court holds with respect to each of these contentions that no violation occurred, and if it did, the law was not clearly established at the time of the violation.
1. No Violation of the Fourth Amendment
Ellison makes three distinct claims under the Fourth Amendment. First, she argues that the NPD Defendants entered her home without consent, probable cause, or a warrant, and that even if she did consent to their presence, her consent was revoked during their visit. Next, she argues that her seizure was unreasonable because the officers lacked probable cause and executed the alleged seizure in an unconstitutional way.
The NPD Defendants contend in response that Ellison consented to their presence, that they had at least arguable *1349 probable cause to be in her home and to transport her to the hospital, and that the means used to effect the transport were reasonable.[9]
a. The NPD Defendants Were Lawfully Present in Ellison's Apartment
To begin, the Court finds that the officers' bodycam evidence demonstrates that Ellison consented to all three officers' entry and continued presence in her home. "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia , 890 F.2d 355, 360 (11th Cir. 1989). When Hobbs and Condit first arrived, Ellison greeted Hobbs with a hug and began telling him about herself. She invited them into "her office" and said, "I'm letting you in my house." Hobbs bodycam-1 [98] at 8:46. She told them they did not have to take their shoes off because she knows about law enforcement from her father's career as a secret service agent.
Ellison argues that when she shut and apparently locked her apartment door-leaving the two officers and EMS outside--this constituted a revocation of consent to their continued presence. The bodycam evidence, however, clearly shows that Ellison re-invited Officer Hobbs into her apartment and that the others were permitted to follow after.
When Sergeant Ayers arrived a little later, Ellison also welcomed her warmly into her apartment and began to question Sergeant Ayers about her law enforcement career.[10] Thus, the Court finds that Ellison consented to the NPD Defendants' presence in her home.
Even if Ellison was correct that at some point she revoked her consent to the officers' presence in her apartment, the Fourth Amendment was not violated.
The Fourth Amendment's prohibitions against warrantless actions do not apply when the officers had "both exigent circumstances and probable cause" for their presence. Roberts , 643 F.3d at 905. "[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception." Id. (alteration in original) (quoting United States v. Holloway , 290 F.3d 1331, 1337 (11th Cir. 2002) ). The Court finds that its probable cause analysis and conclusion for the CCFD Defendants applies equally to the NPD Defendants. See supra Part III.A.2.a. The emergency nature of the situation and Ellison's mental state made it objectively reasonable for the officers to think that she was in need of aid. Thus, their warrantless presence was justified.
Ellison argues that once the officers saw that she was alive and well, their justification *1350 evaporated and they were no longer permitted to remain in her home. The Eleventh Circuit rejected this same argument in Roberts. It held that "it was objectively reasonable for [the officer] to believe that [the plaintiff] might still be in need of immediate aid even though she was alive." Roberts , 643 F.3d at 905 ; see also id. ("[A] showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." (quoting Monday v. Oullette , 118 F.3d 1099, 1102 (6th Cir. 1997) ). Like in Roberts , the NPD Defendants arrived on scene with information that made it objectively reasonable for them to believe there was a probability that Ellison was a danger to herself or others. This was only confirmed by their personal experience upon meeting her, and the Court's review of the bodycam evidence shows that this continued throughout the officers' interactions with her.
In short, the bodycams demonstrate that the officers had probable cause and exigent circumstances justifying their warrantless presence in her home. Moreover, the scope of their presence was no broader than the exigencies called for at the time. See id.
While outcomes do not drive its analysis, the Court considers that if the Court held that the Fourth Amendment was violated during this encounter with Ellison, its decision would be tantamount to second-guessing their on-scene decision to render aid. The decision would mean the officers were required to leave Ellison alone in her impaired state. "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here." Michigan v. Fisher , 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) ; see also Roberts , 643 F.3d at 905 ("The officer's conduct is 'evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences.' " (quoting Holloway , 290 F.3d at 1339 ) ).
b. The NPD Defendants Used Justifiable Means to Transport Ellison to the Hospital
First, the Court begins by reiterating that the NPD Defendants had at least arguable probable cause believe Ellison was a danger to herself or others and needed to be transported to the hospital. But Ellison challenges not the fact of her seizure, but how it was accomplished. She alleges that several of the incidents were unreasonable under the Fourth Amendment because they violated her right to bodily privacy by exposing her naked or nearly naked body.
The Eleventh Circuit has stated that it is clearly established that "absent a legitimate reason, individuals maintain a right to bodily privacy, in particular the right not to have their genitals exposed to onlookers." Mitchell v. Stewart , 608 F. App'x 730, 735 (11th Cir. 2015). Without a legitimate reason, a Fourth Amendment seizure may be unreasonable.
Whether an exposure is justified depends on the circumstances of the seizure during which the exposure occurs. This conclusion is supported by the Supreme Court's ruling in Los Angeles County v. Rettele , 550 U.S. 609, 127 S.Ct. 1989, 167 L.Ed.2d 974 (2007). There, the plaintiffs sued police officers who ordered them to get out of bed-where they were unclothed-during the officers' execution of a valid search warrant. The plaintiffs were in bed when the officers entered their bedroom. They were ordered to get out of bed and were not permitted to clothe until the officers confirmed that there were no *1351 weapons on them or in their immediate vicinity (the officers knew that the objects of the warrant might have been armed).
The Supreme Court held that there was no violation of the Fourth Amendment's prohibition against unreasonable seizures due to officers' safety concerns and the short duration of the plaintiffs' exposure in light of the need to secure the scene. Thus, Retelle stands for the proposition that the Fourth Amendment privacy interest is violated only when an exposure is "longer than necessary to protect [the officers'] safety" or effectuate some other legitimate purpose. 550 U.S. at 615, 127 S.Ct. 1989. With this in mind, the Court analyzes each of the alleged infringements of bodily privacy.
The Court rejects Ellison's argument that the Fourth Amendment was violated when Hobbs grabbed her in the hallway and her breasts were briefly exposed. After Ellison made an unanticipated movement towards him while everyone was gathered outside her apartment, Hobbs restrained her. He held her from behind for a little under a minute. While in his grasp, Ellison resisted, and in so doing her robe became loose, exposing her breast. One of the defendants quickly covered her, resulting in an exposure of no more than a few seconds.
As an initial matter, the Court holds that Hobbs was justified in this brief restraint because he had arguable probable cause to believe that Ellison was a danger to herself or others due to the general circumstances and her un-anticipated movement toward Hobbs that night. Ellison's exposure during this brief tussle was an accidental consequence of Hobbs's justified restraint. The exposure was also quickly remedied. As a result, this incident did not violate the Fourth Amendment.
For similar reasons, the Court holds that Ellison's exposure during the application of soft restraints by the CCFD Defendants and Hobbs was justified. The use and application of restraints, as the Court has held, were justified. The exposure during their application was due largely to Ellison's resistance in their application. Like the hallway incident, this brief restraint was justified as the officers attempted to subdue Ellison for transport to the hospital.
Finally, Ellison's transport in only her bathrobe was justified. The bodycam evidence demonstrates that Ellison had the opportunity to get dressed on her own, but was in no mental state to execute such a plan. The Defendants were not required to force her to get dressed, nor are they required to wait an indefinite period before effecting her transport. They had probable cause to seize her and take her to the hospital as described above, and even though she was only in a bathrobe, she was largely covered. Thus, her exposure was not unreasonable under the Fourth Amendment.
2. No Fourteenth Amendment Due Process Violation
The Court does not belabor the due process issue here. Its analysis regarding the CCFD Defendants applies equally to the NPD Defendants. No pre-deprivation hearing was required, Georgia provides adequate post-deprivation remedies, and Ellison failed to take advantage of the available post-deprivation remedies. Thus, the Court similarly holds that the NPD Defendants did not violate Ellison's Fourteenth Amendment due process rights.
3. No Fourth and Fourteenth Amendment Violation Based on Negligent Supervision
Ellison lastly argues that Sergeant Ayers is liable for her failure to *1352 properly supervise her subordinates, Hobbs and Condit, in such a manner that caused her to be deprived of her constitutional rights. "[S]upervisors are liable under [ section] 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.' " Keating v. City of Miami , 598 F.3d 753, 762 (11th Cir. 2010) (quoting Gonzalez v. Reno , 325 F.3d 1228, 1234 (11th Cir. 2003) ).
Here, there is no constitutional violation by either Hobbs or Condit. Thus, this claim fails. See Lepper v. Nguyen , 368 F. App'x 35, 40 (11th Cir. 2010).
C. Ellison's Motion to Amend
Ellison has also filed a motion [88] to amend her complaint. Her proposed amendment includes only legal conclusions related to whether the Defendants in this case were acting within their discretionary authority. This is a legal question that the Court dealt with on the merits, and therefore amendment would be futile and moot; it would not affect the outcome of the case or the Court's analysis. See Foman v. Davis , 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (including "futility of amendment" among the reasons justifying denial of a motion to amend). Ellison's motion [88] is accordingly denied.
D. Ellison's State-law Claims
Ellison has also alleged a number of state-law causes of action in addition to her federal claims. But now that the Court has disposed of the federal claims, it declines to exercise pendant jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3) ; Flowers v. Troup Cty. , 1 F.Supp.3d 1363, 1382 (N.D. Ga. 2014).
The Supreme Court has recognized that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant-jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill , 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).
The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co. , 370 F.3d 1086, 1089 (11th Cir. 2004). "State courts, not federal courts, should be the final arbiters of state law." Baggett v. First Nat'l Bank of Gainesville , 117 F.3d 1342, 1353 (11th Cir. 1997) ; see also Cohill , 484 U.S. at 350, 108 S.Ct. 614 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (footnote omitted) ).
Accordingly, the Court declines to exercise supplemental jurisdiction over Ellison's state law claims for breach of contract and fraud, and dismisses them without prejudice.
IV. Conclusion
The NPD Defendants' motion [97] for summary judgment against Ellison is granted as to counts 1, 2, 5, 6, 9, and 10.[11]
*1353 The CCFD Defendants' motion [100] for summary judgment is granted as to counts 3, 4, 7, 8, and 10. Ellison's motion [88] to amend her complaint is denied. Plaintiffs' motions [90, 93] for partial summary judgment are denied. And as noted supra , Ellison's motions [89, 130], the CCFD Defendants' motion [96], and the NPD Defendants' motions [95, 122] for leave to file excess pages are granted.
Also pending before the Court are Ellison's motion [133] for discovery and Howard and Gasaway's objections [134] to Ellison's sur-reply brief. The motions and objections are respectively denied and overruled because they are moot, in that they pertained to state law immunity, an issue over which the Court declines to exercise jurisdiction. For the same reason, the remaining counts (counts 11 through 16) in the amended complaint are dismissed without prejudice.
The Court having disposed of all pending matters before it, the Clerk is directed to close this case.
IT IS SO ORDERED this 25th day of September, 2018.

Also before the Court are Ellison's motions [89, 130], the CCFD Defendants' motion [96], and the NPD Defendants' motions [95, 122] for leave to file excess pages. These motions are granted for good cause in light of the voluminous allegations and need for robust briefing.

The Court relies both on the parties' agreed-to statements of material facts as well as the NPD Defendants' body-wearable camera ("bodycam") footage and 911 recording from the night of the incident. Where the bodycam footage contradicts the parties' version of the facts (particularly Ellison's, who argues the existence of a number of disputes that are demonstrably contradicted by the video footage), the Court relies on the video evidence for its findings of fact. See Singletary v. Vargas , 804 F.3d 1174, 1183 (11th Cir. 2015) (citing Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ). This is especially salient with respect to the Court's resolution of disputes in favor of the bodycam evidence for Ellison's contentions that she did not consent to the Defendants' presence in her home and that the Defendants lacked probable cause to believe she was a danger to herself and/or others.

Ellison makes much of O.C.G.A. § 31-11-53(a)(1)'s provision that certified EMTs "may ... [r]ender first-aid and resuscitation services as taught in the United States Department of Transportation [ ("USDOT") ] basic training courses for emergency medical technicians or an equivalent course approved by the department[.]" Ellison contends that the USDOT guidelines, like the SOPs, limit the means by which the CCFD Defendants may perform their jobs. Therefore, Ellison argues, their failure to comply with them means they acted outside their discretion. The Court rejects this argument for several reasons. First, the language in § 31-11-53 is permissive, not mandatory-it employs the word "may" rather than "must" and allows the DPS to promulgate alternative training guidelines. The USDOT guidelines are, if anything, instructive rather than determinative in this inquiry. Moreover, the Court has already shown how the CCFD Defendants complied with an "equivalent course." Id. § 31-11-53(a)(1). Finally, as Andrews instructs, failure to comply with governing procedures does not ipso facto mean a public official acted outside his discretionary authority.

The Court assumes that a seizure occurred.

There is no serious dispute that Ellison has a liberty interest in being free from an involuntary detention that entitles her to some level of due process protection. This is true even for a detention in an emergency situation, particularly as a prelude to involuntary civil commitment. See Lynch v. Baxley , 744 F.2d 1452, 1457-58 (11th Cir. 1984) ("As a necessary prologue to involuntary commitment, emergency detention also constitutes a deprivation of liberty which the state cannot accomplish without due process of law.").

Ellison does not challenge the sufficiency of the procedures under Georgia law for due process purposes.

Ellison challenges the admissibility of her medical records, including the Form 1013 and those statements found in paragraphs 67, 68, 69, and 71 of the CCFD Defendants' statement of additional material facts. She argues that Georgia's psychiatric/mental-health privilege under O.C.G.A. § 24-12-1 bars their admission. This objection is overruled. This case is premised upon federal-question jurisdiction under § 1983, meaning that federal law provides the rule of decision. Hancock v. Hobbs , 967 F.2d 462, 466-67 (11th Cir. 1992). This is true even if there are pendant state-law claims. Id. "Federal common law does not recognize a psychiatrist-patient privilege" such as that found under Georgia law. Id. at 466. Accordingly, the Court may consider this evidence for purposes of ruling on the motions for summary judgment.

The Court rejects Ellison's contentions that the NPD Defendants acted outside their discretionary authority for the same reasons this argument was rejected as to the CCFD Defendants. See supra Part III.A.1. In fact, the case is even stronger here. But for Ellison's allegations that the NPD Defendants violated her constitutional rights by failing to follow the Georgia statutory procedures, it would have been within the scope of these Defendants' authority to transport Ellison for the purposes of a mental evaluation.

Ellison did not press for liability for the CCFD Defendants' entry into the home in the same manner as she did for the NPD Defendants. But the Court notes that the same facts and analysis would apply to those Defendants. They were present at the same time performing actions in concert with those of the NPD Defendants and had similar probable cause and exigent circumstances to be present in her apartment. See, e.g. , May , 846 F.3d at 1329.

Ellison relies extensively on "expert" evidence about, for example, whether the NPD Defendants effected a lawful seizure, whether they complied with Georgia law, and whether their actions were otherwise reasonable. The Court finds most of this evidence to be inadmissible legal conclusions. The Court cannot allow expert evidence, even well-qualified and un-rebutted, to supplant its role as the arbiter of the law in this case. Cf. Burkhart v. Wash. Metro. Area Transit Auth. , 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Ellison's claim for attorneys' fees is derivative of her other claims, which have been dismissed. Thus, with respect to the § 1983 claims, all Defendants are entitled to summary judgment on this claim as well.